## ROGERS *v.* RITTER.

Where a court on the preliminary examination of a witness can see that he has that degree of knowledge of a party's handwriting which will enable him to judge of its genuineness, he should be permitted to give to the jury his opinion on the subject, though he have never seen the party write nor corresponded with him.

ERROR to the Circuit Court for the District of California; the case being this:

Rogers brought ejectment against Ritter in the court below to recover a lot of land in San Francisco, known by the name of Yerba Buena. The plaintiff having given in evidence various deeds, and rested, the defendants offered a writing, dated Yerba Buena, December 5th, 1845, purporting to be a petition by one Briones for the grant of the lot, under which was written an instrument dated December 7th, 1845, purporting to be a grant of the lot by "the citizen José de la Cruz Sanchez, *justice of the peace* of the jurisdiction." The " grant " was objected to on the ground that the name of Sanchez was forged. To prove its genuineness, the defendant called three witnesses. One *Sears*, who had been clerk in the recorder's office of San Francisco for eight years, and having the especial charge of the records; *R. C. Hopkins*, who had resided in California for fourteen years, had had charge of the Spanish archives in the office of the Surveyor-General of the United States for California for nine years, " whose business called upon him to investigate questions of the genuineness of documents," and who "thought that he had a facility from his profession of detecting writing which was not genuine;" and one *Fisher*, who had been in California for fourteen years, and was secretary, interpreter, and custodian of the archives for over four years, and until its expiration, of the land commission of the United States, which sat in California under the act of March 3d, 1851.

In order to lay a foundation for his competency each witness, as called, was requested to state whether he was acquainted with the handwriting of Sanchez, and to give his

means of knowledge. Each and all answered that they were familiar with it, and told how they knew it.

*Sears* had frequently seen it in his office, and had, many times, made certified copies of the papers to which it was attached, for the use of the courts, and knew it to his own satisfaction. In speaking of it and the handwriting of another person, he said, " I have seen so many instruments and papers passing through my hands that these signatures (naming them) are like household implements with us." But he had not corresponded with Sanchez nor actually seen him write.

*Hopkins* had examined the correspondence of Sanchez, while justice of the peace, with the governor, and other papers in the archives to which his signature was affixed, quite often, and conceived himself, therefore, well acquainted with it; " I think," was his testimony, " no one living is so familiar with these California archives as I am." But he had not corresponded with Sanchez nor actually seen him write.

Fisher testified that he thought that he would know the signature of Sanchez, because he had the custody, during the whole term of the board of land commissioners, of all the depositions taken by them, and acted as interpreter for those who could not speak the English language. The party making the depositions was required, as the witness testified, to sign them after one of the commissioners had administered the oath. Then they passed into Fisher's hands, as secretary, who indorsed them and put them among the papers of the case. Sanchez's testimony with many others, was taken, and, although Fisher could not swear he had actually seen him write his name, he believed he had, and, at any rate, he should know his signature from having seen it to the depositions.

The Circuit Court, after the witnesses had stated the manner in which they formed their knowledge of the handwriting of Sanchez, allowed them—exception being duly taken—to testify whether his signature to the grant in controversy was genuine or not. And they testifying that they believed it to be genuine, the grant was allowed to go to the

jury, no objection being taken to it from the fact of its purporting to be made by a "justice of the peace of the jurisdiction," A. D. 1845.

Verdict and judgment having gone for the defendant the case was brought here.

It was one incident of the trial that Sanchez himself, who was alleged to have made the grant, swore that though he had been "a justice of the peace of the jurisdiction" in 1845, he had never made this grant nor any grant of the lot in controversy; as it was another that Hopkins, who was examined to rebut the evidence of Sanchez, testified that he "knew it to be generally the case, or sometimes the case, that in regard to the genuineness of the signatures and acts of officers of the old Mexican government, the true test is not what they will swear to, but the testimony of experts."

*Messrs. M. Blair and F. A. Dick, for the plaintiff in error;* plaintiff also below.

1. The so-called grant purported to be by a "justice of the peace of the jurisdiction." It is a fact shown by various laws of Mexico, by the history of the Departmental Assemblies of California, and by the acts of the governors of California, and by judicial decision,* that no such officer had power to grant land after the end of the year 1843. It was a right of the alcaldes of the city of San Francisco. The grant, therefore, even if genuine, should have been excluded from the jury.

2. The court below erred in admitting what was but the opinion of Sears, Hopkins, and Fisher, the defendant's witnesses, as evidence that the signature of Sanchez was genuine. The "knowledge" of the signatures which these witnesses had was acquired, not from having seen Sanchez write, nor from having corresponded with him, but from seeing writing supposed to be his, and from nothing more. The testimony was, in truth, but a comparison of handwrit-

---

* Cohas v. Raisin, 3 California, 449; Hubbard v. Barry, 21 Id. 325.

ings, and did not render opinions of the persons so compar-
ing the handwriting, legal evidence.*

There should the less willingly be a departure from an-
cient rules of caution, as Sanchez swears that the signature
is not genuine.

Mr. Justice DAVIS delivered the opinion of the court.

The objection to the grant, which, supposing it genuine,
is insisted on in the first place, in this court, by the counsel
of the plaintiff in error, presents a question which in the
state of the record this court is not called upon to decide;
for it does not appear that the objection was taken in the
court below. It is true. that the grant was attacked there,
but on an entirely different ground. The main controversy
concerning it was, whether or not it was genuine. Its
validity, if genuine, does not seem to have been questioned.
We are not, therefore, required to travel through the various
laws of Mexico, the acts of California governors, and the
proceedings of. Departmental Assemblies to determine at
what period of time the powers of justices of the peace, act-
ing as alcaldes, to grant building lots within their jurisdic-
tion, ceased.

It is insisted, in the second place, that comparison of
handwriting is in no case legal evidence, and as it was ad-
mitted to prove the genuineness of the disputed paper, the
judgment should, on that account, be reversed. It is cer-
tainly true that the ancient rule of the common law did not
allow of testimony derived from a mere comparison of hands,
and equally true that there has been a great diversity of
opinion, in the different courts of this country, in relation
to this species of evidence. But in England this rule of the
common law, as it respects civil proceedings, has been ab-
rogated by the legislature, so that in the courts there, at the
present day, in civil suits, the witness can compare two ·

---

* 2 Phillips's Evidence, 595–613, and notes, 480, 481, and 483; 2 Starkie
on Evidence, 512–518; 1 Greenleaf on Evidence, §§ 577 and 578; Strother
v. Lucas, 6 Peters, 767; Greaves v. Hunter, 2 Carrington & Payne, 477;
Goldsmith v. Bane, 3 Halsted, 87; Thatcher v. Goff, 11 Louisiana, 94, 98.

writings with each other, in order to ascertain whether they were both written by the same person.* It is, however, not necessary for the purposes of this case to discuss the subject in all its bearings, nor to depart from the rule laid down by this court in *Strother* v. *Lucas*,† that evidence by comparison of hands is not admissible when the witness has had no previous knowledge of the handwriting, but is called upon to testify merely from a comparison of hands. The witnesses who testified in this case had previous knowledge of Sanchez's handwriting. It is true this knowledge was not gained from seeing him write, nor from correspondence with him, but in a way equally effectual to make them acquainted with it. Sanchez was for many years, under Mexican rule in California, in official position, acting as justice of the peace, transacting the duties of alcalde, corresponding with the governor, and exercising for a time the power conferred upon him to grant small parcels of land to deserving persons.‡ Necessarily, in the course of the administration of the duties of his office, he had occasion frequently to attach his signature to papers of importance. These papers, after the United States took possession of the country, were deposited in the recorder's office of San Francisco, and the Surveyor-General's office, where the Mexican archives are kept. Sanchez also, as did most of the native Californians and Mexicans who had been in public life, appeared before the United States land commission, which sat in San Francisco to determine the validity of Spanish grants, and gave his depositions. These depositions, with the other papers of the commission, at the expiration of it, were taken to the office of the Land Commissioner at Washington. As no question was raised on the trial of the genuineness of these various writings—Sanchez was present and interposed no objection—they must be considered, if not as having been acknowledged by him, at least as having been proved to the satisfaction of the court.

In this condition of things, Sears, Hopkins, and Fisher

---

\* 2 Taylor on Evidence, §§ 1667–8.       † 6 Peters, 763.

‡ Colonial History of San Francisco, by Dwinelle.

were called upon to testify upon the subject of the disputed signatures; and the inquiry is, did the court err in its ruling on this point? Obviously, the evidence is not obnoxious to the objection that it is a mere comparison of hands; that is, a comparison by a juxtaposition of two writings, in order to enable a witness, without previous knowledge of the handwriting of the party, to determine by such comparison whether both were written by the same person.

The witnesses in this case were conversant with the signature of Sanchez, and swore to their belief, not by comparing a disputed with an acknowledged signature, but from the knowledge they had previously acquired on the subject. The text-writers all agree, that a witness is qualified to testify to the genuineness of a controverted signature if he has the proper knowledge of the party's handwriting. The difficulty has been in determining what is proper knowledge, and how it shall be acquired. It is settled everywhere, that if a person has seen another write his name but once he can testify, and that he is equally competent, if he has personally communicated with him by letter, although he has never seen him write at all. But is the witness incompetent unless he has obtained his knowledge in one or the other of these modes? Clearly not, for in the varied affairs of life there are many modes in which one person can become acquainted with the handwriting of another, besides having seen him write or corresponded with him. There is no good reason for excluding any of these modes of getting information, and if the court, on the preliminary examination of the witness, can see that he has that degree of knowledge of the party's handwriting which will enable him to judge of its genuineness, he should be permitted to give to the jury his opinion on the subject.

This was done in this case, and it is manifest that the three witnesses told enough to satisfy any reasonable mind that they were better able to judge of the signature of Sanchez, than if they had only received one or two letters from him, or saw him write his name once.

JUDGMENT AFFIRMED.