# HICKORY v. UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
WESTERN DISTRICT OF ARKANSAS.

No. 841. Submitted October 19, 1893. — Decided January 15, 1894.

The genuineness of disputed handwriting cannot, as a general rule, be de-
termined by comparing it with other handwriting of the party.

A writing specially prepared for purpose of comparison is not admissible.

If a paper, admitted to be in the handwriting of the party or to have been
subscribed by him, is in evidence for some other purpose in the cause,
the paper in question may be compared with it by the jury; but if
offered for the sole purpose of comparison, it is not admissible.

The right of a person indicted for a capital offence to have delivered to
him, under Rev. Stat. § 1033, at least two days before the trial, a list
of the witnesses to be produced, may be waived by sitting by and lis-
tening to the testimony in chief of a witness not on such list, before
inquiring whether his name had been furnished to defendant.

Proof of contradictory statements by one's own witness, voluntarily called
and not a party, is in general not admissible, although the party call-
ing him may have been surprised by them; but he may show that the
facts were not as stated, although this may tend incidentally to discredit
the witness.

Whether or not a particular homicide is committed in repulsion of an
attack, and, if so, justifiably, are questions of fact, not necessarily
dependent upon the duration or quality of the reflection by which the
act may have been preceded.

*Allen* v. *United States*, 150 U. S. 151, followed in condemning the doctrine as
impracticable, which tests the question whether a person on trial for
murder is entitled to excuse on the ground of self-defence, or exceeded
the limits of the exercise of that right, or acted upon unreasonable
grounds, or in the heat of passion, by the deliberation with which a
judge expounds the law to a jury, or the jury determines the facts, or
with which judgment is entered and carried into execution.

Matter excepted to should be brought to the attention of the court before
the retirement of the jury.

When several distinct propositions are given, and the exception covers all
of them, it cannot be sustained if any one of them is correct.

SAM DOWNING, alias Sam Hickory, and Tom Shade, two
Cherokees, were indicted and tried for the murder of Joseph
Wilson, a United States deputy marshal, the trial resulting in

the acquittal of Shade and the conviction of Hickory, who, being sentenced to death, prosecuted this writ of error. As stated in the brief for the government, Hickory admitted that he killed Wilson, but claimed that he was the attacking party; that the marshal came to arrest him for a violation of the liquor laws, and after the arrest, and while he was proceeding toward his house to get a saddle, the marshal began firing at him; that he ran into the house and an affray occurred there, in which there was shooting by both, until the marshal was killed; that he concealed the body in a ravine, where it was found two or three days later; then hid in the neighborhood for awhile, and wandered about until he was arrested among the Osage Indians. One Carey testified that he went with the marshal to show him where Hickory lived, and that it was arranged that he should remain in the woods while Wilson went to the house and made the arrest; that after he had arrested Hickory he would fire his pistol to notify Carey that he had done so, so that Carey could meet him at a designated point; that in about half an hour Carey heard a shot, followed by several others.

There was some evidence that Wilson's skull had been fractured; also that Wilson's horse was found dead, with his throat cut, lying in an opposite direction from the body; and an attempt to show that Wilson, after being wounded by Hickory, was finally killed with an axe by Shade.

A letter written in the Cherokee alphabet, claimed to be in Hickory's handwriting, to Ollie Hickory, alias Williams, was put in evidence and marked " A," and was interpreted as follows: "October 15th, 1891. Ollie: I write you a few lines. You must never disclose how this is about Tom Shade. Just say that I was the only one that did it. You must never tell anybody that he killed the horse and all that he done. I tell you you must not. That is all now. I write in haste. Sam."

The letter was identified as in Hickory's handwriting, although he denied it, and was admitted under exception on the part of the defendants. Joseph Shade, a witness for the defence, produced a paper on cross-examination, not relevant in itself, which was marked " X," which he testified was in Hick-

ory's handwriting, and which seems to have been put in evidence without objection.

An expert in Cherokee handwriting testified on behalf of the defendants, on comparisons of Exhibits " A " and " X," that they were written by different persons, and that the only resemblance was in the signatures. Another witness testified that " A " was not in Hickory's handwriting, but that " X " was.

*Mr. A. H. Garland* for plaintiff in error.

*Mr. Assistant Attorney General Whitney* for defendants in error.

Mr. Chief Justice Fuller, after stating the case, delivered the opinion of the court.

1. Hickory being called in his own behalf, denied that the letter marked " A " was in his handwriting. His counsel offered a paper which Hickory testified he had written at the table in court that day, " to compare with the writing on the document marked ' X,' as produced by Joseph Shade, written previous to this time, and also to compare with the writing marked ' A,' offered in evidence by the district attorney." The court excluded the evidence and the defendant excepted.

According to the general rule of the common law, the genuineness of disputed handwriting could not be determined by the court and jury by comparing it with other handwriting of the party, but among the exceptions to the rule was that if the paper admitted to be in the handwriting of the party or to have been subscribed by him was in evidence for some other purpose in the cause, the paper in question might be compared with it by the jury. *Moore* v. *United States,* 91 U. S. 271; *Rogers* v. *Ritter,* 12 Wall. 317. And this with or without the aid of witnesses. 1 Greenl. Ev. § 578.

By acts of Parliament it is now provided in England, as " to all courts of judicature, as well criminal as others," " that comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine, shall be permitted

to be made by the witnesses; and such writings and the evidence of witnesses respecting the same, may be submitted to the court and jury as evidence of the genuineness, or otherwise of the writing in dispute." 17, 18 Vict. c. 125; 28, 29 Vict. c. 18.

Under these statutes it has been decided that any writings, of the genuineness of which the judge is satisfied upon the proof, may be used for the purposes of comparison, although they may not be admissible for any other purpose in the cause. *Birch* v. *Ridgway*, 1 Fost. & Fin. 270; *Cresswell* v. *Jackson*, 2 Fost. & Fin. 24; and that the comparison may be made either by witnesses or without the intervention of any witnesses at all, by the jury themselves. *Cobbett* v. *Kilminster*, 4 Fost. & Fin. 490; 1 Whart. Ev. § 712. But in the absence of statute, papers irrelevant to the issues on the record were held not receivable in evidence at the trial for the mere purpose of enabling the jury or witnesses to institute a comparison of hands. *Bromage* v. *Rice*, 7 Car. & P. 548; *Doe* v. *Newton*, 5 Ad. & El. 514; *Griffits* v. *Ivery*, 11 Ad. & El. 322; 1 Greenleaf Ev. § 580. The danger of fraud or surprise and the multiplication of collateral issues were deemed insuperable objections, although not applicable to papers already in the cause, in respect of which, also, comparison by the jury could not be avoided.

We do not care to discuss the reasons for the rule or examine the decisions by the courts of the several States, in which there is great want of uniformity, for the question here does not turn on the general rule in relation to comparison of handwriting or the admission of irrelevant papers for the sole purpose of comparison, but on the question of the admissibility of such writings when specially prepared for the purpose; and we are clear that they are not admissible. Undoubtedly circumstances may often arise where a witness may be asked, on cross-examination, to write in the presence of the jury, for the purpose of testing his credibility; but as original evidence, as remarked in *King* v. *Donahue*, 110 Mass. 155, 156, " A signature made for the occasion *post litem motam* and for use at the trial ought not to be taken as a standard of genuineness."

"It would," as was said in *Williams* v. *State*, 61 Alabama, 33, 40, 83, "open too wide a door for fraud, if a witness was allowed to corroborate his own testimony by a preparation of specimens of his writing for the purposes of comparison."

"All evidence of handwriting," says Greenleaf, (1 Ev. § 576,) adopting the language of Patteson, J., in *Doe* v. *Suckermore*, 5 Ad. & El. 730, "except where the witness sees the document written, is in its nature comparison. It is the belief which a witness entertains upon comparing the writing in question with an exemplar in his mind derived from some previous knowledge." We think, however, there is an obvious distinction between comparison by juxtaposition of an admitted or established writing and the disputed writing, and comparison of the latter with an image in the mind's eye, but in either instance papers prepared for the purpose of having the comparison made are objectionable.

In *Stranger* v. *Searle*, 1 Esp. 14, Lord Kenyon refused to admit the testimony of a witness whose familiarity was derived from seeing him write for the express purpose of qualifying the witness, "as the party might write differently from his common mode of writing through design."

It is only when the paper is written, not by design but unconstrainedly and in the natural manner, so as to bear the impress of the general character of the party's writing, as the involuntary and unconscious result of constitution, habit, or other permanent cause, and therefore of itself permanent, that it furnishes, if otherwise admissible, any satisfactory test of genuineness. Coleridge, J., *Doe* v. *Suckermore*, 5 Ad. & El. 703, 705.

The paper offered was rightly excluded by the court.

2. The admission of the testimony of one Charles H. Snell was objected to upon the ground that his name was not on the indictment, and the objection was overruled because not made until the examination-in-chief was concluded. The record shows no exception taken, though counsel expressed a desire to save the point. Under section 1033 of the Revised Statutes, any person indicted of a capital offence has the right to have delivered to him, at least two days before the trial, a list.

of the witnesses to be produced, and it would be error to put him on trial and allow witnesses to testify against him whose names have not been furnished, if he seasonably asserted his right, *Logan* v. *United States*, 144 U. S. 263; but we think he did not do that here, and that the defect was waived. It was suggested by counsel for the defendant that the objection was made as soon as it was discovered that notice had not been given in respect to this witness; but we are of opinion that the discretion of the trial court was properly exercised upon the question. Counsel ought not to sit by and listen to the testimony in chief of a witness before inquiring whether his name has been furnished to the defendants.

3. It is assigned as error that the court did not allow "defendants to show that they were surprised by the testimony of John Johnson, a witness for defendants, and to show previous declarations of said John Johnson to defendants' counsel through an interpreter on several occasions during the preparation of said case contrary to his testimony on the stand, which declarations were favorable to defendants." Johnson was called for defendants and testified that defendant Shade was at his house Tuesday evening, but not again until Friday evening. He was asked if he had not stated to defendants' counsel, through Isaac Shade as interpreter, that Tom Shade was there on Wednesday and Thursday evenings also, but he answered that he had not, and that the interpreter was mistaken. Thereupon Isaac Shade was subsequently asked: "State whether or not in your interpretation of his testimony that he said that Tom stayed at his house Tuesday night, Wednesday night, and Thursday night and Friday night of that week," to which objection was made, which the court sustained, and defendants excepted.

During the trial there was an attempt to show that Wilson survived the shooting, which was on Tuesday afternoon, and that defendant Shade afterwards, and by collusion with Hickory, slew the wounded man with an axe. It is possible that, if the evidence had tended to establish that Hickory and Shade had conspired to compass Wilson's death, testimony in support of Shade's alibi for the two days succeeding Tuesday-

(assuming it made out as to that day) might have been material as to Hickory; but upon this record the bearing upon Hickory of Shade's whereabouts on Wednesday and Thursday is extremely slight, and Shade was acquitted.

When a party is taken by surprise by the evidence of his witness, the latter may be interrogated as to inconsistent statements previously made by him for the purpose of refreshing his recollection and inducing him to correct his testimony; and the party so surprised may also show the facts to be otherwise than as stated, although this incidentally tends to discredit the witness. As to witnesses of the other party, inconsistent statements, after proper foundation laid by cross-examination, may be shown; *Railway Company* v. *Artery*, 137 U. S. 507; but proof of the contradictory statements of one's own witness, voluntarily called and not a party, inasmuch as it would not amount to substantive evidence and could have no effect but to impair the credit of the witness, was generally not admissible at common law. Best Ev. § 645; Whart. Ev. § 549; *Melhuish* v. *Collier*, 15 Q. B. 878.

By statute in England and in many of the States, it has been provided that a party may, in case the witness shall in the opinion of the judge prove adverse, by leave of the judge, show that he has made at other times statements inconsistent with his present testimony, and this is allowed for the purpose of counteracting actually hostile testimony with which the party has been surprised. *Adams* v. *Wheeler*, 97 Mass. 67; *Greenough* v. *Eccles*, 5 C. B. (N. S.) 786; *Rice* v. *Howard*, 16 Q. B. D. 681.

Johnson was not a hostile witness, and his testimony was not in itself prejudicial so far as it failed to make out the alibi beyond Tuesday, yet it did contradict defendant Shade, who testified that he was at Johnson's Wednesday and Thursday nights. But the court allowed defendants' counsel to cross-examine Johnson if they chose, and to prove the fact to be otherwise than as stated by him, and we cannot say that error was committed because the court in the exercise of its discretion, under the circumstances, declined to concede any further relaxation of the rule.

4. Defendants took certain exceptions to parts of the charge, the first of which was to: "The court's criticism on circumstantial evidence, denouncing persons who are slow to act on circumstantial evidence as fools and knaves." Referring to the necessity of determining the condition of the mind, the court said : "Some say we cannot do it by circumstantial evidence, because it is cruel and criminal, they say, to convict a man upon circumstantial evidence. This is a declaration of either fools or knaves, sympathetic criminals or men who have not ability enough to know what circumstantial evidence is, or to perform the ordinary duties of citizenship. When you consider that these two mental conditions, the fact that the act was done wilfully, and done with malice aforethought, can never in any case be found in any other way than by circumstantial evidence, you can see the potency in every case of that class of testimony. Circumstantial evidence means simply that you take one fact that has been seen, that is produced before you by evidence, and from that fact you reason to a conclusion." The exception gives a color to this part of the charge which it will not bear, namely, that it amounted to a denunciation of persons "who were slow to act on circumstantial evidence," whereas the court was inveighing against the declaration that it is cruel and criminal to convict a man upon circumstantial evidence, and that the condition of the mind cannot be found in that way. This was done with great vigor, perhaps induced by the arguments of counsel, but that does not strengthen an exception otherwise destitute of merit.

5. The second exception to the charge was as follows :

"Because the court instructed the jury that the defendant, Downing, or the party who invokes the law of self-defence, at the time of the difficulty puts himself in the place of the judge that lays down the law, of the jury who passes upon the facts and enters up judgment, and of the marshal who executes the sentence, and has centred in himself the whole power of the government or people, without telling them that he is not required to look at the case and the occurrences with the same coolness and deliberation that a court and jury would do in investigating the charge against him, and that, if in this

case, as claimed by him, the officer Wilson fired off his pistol in the first place when his back was to him, and led defendant, Downing, to believe that the officer was assaulting him, or the officer did then and afterwards assault him, then all the circumstances of excitement, agitation, apparent or real peril that surrounded him, and that may have caused him to misjudge as to the purpose of Wilson, or as to the assault, or to misconceive as to his exact rights and duties, are all to be taken into consideration."

Hickory's defence was that the homicide was committed in self-defence, that is, that he was assaulted by Wilson upon a sudden affray, and killed him because he was in imminent and manifest danger either of losing his own life or of suffering enormous bodily harm; or that he was under a reasonable apprehension thereof, and the danger, as it appeared to him, was so imminent at the moment of the assault as to present no alternative of escaping its consequences, except by resistance.

The experienced trial judge told the jury that the mere fact that a killing is done wilfully does not necessarily make it murder; that it is also done wilfully when done in self-defence; and explained the characteristics of that malice the existence of which is the criterion of murder, defining malice in the ordinary acceptation of the term, and malice aforethought, malice express and malice implied, and pointing out that the requisite malice exists when the act is perpetrated without any provocation or any just cause or excuse, not only on special motive or through special malevolence, but also at the dictates of a heart regardless of social duty and deliberately bent on mischief; and, saying that such malice imported premeditation, thus continued: "The doing of the act which kills must be thought of beforehand. But how long, you will inquire in this case? A minute, or a day, or an hour, or a year? Why, not at all. If it is thought of at a period, practically speaking, cotemporaneous with the doing of the act, it is premeditated, it is thought of sufficiently long. Especially is that the rule applicable in this day, when a man with the rapidity almost of the batting

of an eye or a flash of light may execute a purpose to kill. He may conceive a purpose, and instantly with its conception draw his deadly weapon and execute his purpose before you can bat an eye; the purpose is conceived and executed, and the man is dead, but yet it is premeditated, as shown in a case of that kind by the very drawing and presentation and firing of the gun. The law says, as I will read to you presently, that the deliberate selection and use of a deadly weapon is evidence of the existence of malice aforethought, provided the party had no right to use that weapon, or provided there is an absence of mitigating facts when he did use it." That is to say, that when a homicide is committed by weapons indicating design, then it is not necessary to prove that such design existed at any definite period before the fatal act.

The learned judge then quoted from the charge in *United States* v. *King,* 34 Fed. Rep. 302, (Lacombe, J.,) as follows:

"'It imports premeditation. Therefore there must logically be a period of prior consideration; but as to the duration of that period no limit can be arbitrarily assigned. The time will vary as the minds and temperaments of men, and as do the circumstances in which they are placed. The human mind acts at times with marvellous rapidity. Men have sometimes seen the events of a lifetime pass in a few minutes before their mental vision. Thought is sometimes referred to as the very symbol of swiftness. There is no time so short but that within it the human mind can form a deliberate purpose to do an act; and if the intent to do mischief to another is thus formed, as a deliberate intent, though after no matter how short a period of reflection, it none the less is malice.'"

Manslaughter was defined, and the distinction between that and murder; and the right of self-defence invoked by counsel in the case was then explained. The first proposition as to the justifiable exercise of that right was laid down generally to be that when a man, "in the lawful pursuit of his business, is attacked by another, under circumstances which denote an intention to take away his life, or do him some enormous bodily harm, he may lawfully kill the assailant, provided he use all the means in his power otherwise to save his own life or prevent

the intended harm, such as retreating as far as he can or disabling his adversary without killing him, if it be in his power;" and the second proposition, that "when from the nature of the attack there is reasonable ground to believe that there is a design to destroy his life or to commit any felony upon his person, the killing of the assailant will be excusable homicide, although it should afterwards appear that no felony was intended."

And in this connection, the learned judge charged among other things as follows :

"You see a man is required to discharge certain great duties under all circumstances, and especially is this law of duty incumbent upon him when he is put in that position, in the position of a judge sitting on the bench deliberating upon what the law is, and of a jury sitting in the jury box listening to the facts, and finding as coolly, deliberately, and dispassionately as possible under the circumstances, what the facts are. When a party is in such a condition he is the judge upon the bench and the jury in the box, and not only that, but he is the executioner. He finds what the facts are as a jury, and he makes an application of the law that he finds as a judge to these facts that he finds as a jury, he enters up a judgment, and he then and there as a marshal kills in the furtherance of the judgment. Suppose that the judge of this court had that power, how long would the people of this land permit him to sit on this bench? Suppose that you, as twelve dispassionate citizens, had that power, how long would the people of this land permit that system to exist? Suppose that the chief executive officer of this government, the President of the United States, presumably a discreet, wise, and just man, having no other purpose than the good of the people, had that power, how long would these people permit one man to exercise a power of that kind? Exercise it, too, when he wasn't confronted with acts that inflamed him, or that infuriated him, but exercised it when he was an intelligent man, and just man, as our Presidents have always been, and a fair-minded man. We have divided this power when it comes to be executed deliberately. We have a court that performs one office

and the jury another and the executive arm of the government another. Yet the law of self-defence puts all of these mighty elements of power into the hands of one man, and it may be in a given case that he is not a very intelligent man, either; it may be in a case where he has sought to make application of it, that he is not a very discreet man, or that he is not a very dispassionate man, either, yet if the law applies to his case, if there is an application of that kind that can be correctly made to that condition, it is to be made, although there is a concentration of these mighty powers that would not be concentrated in any department of the government alone, but these great powers in a proper case are properly in the hands of the citizens. . . .

"He is required to avoid the necessity of killing if he can with due regard to his own safety. He must do that. If there is a condition where the other party at the time of the killing is doing an act of violence upon him, and he is in the right, and that would take his life unless he avoided it, and he can avoid it otherwise than by killing, and he does not do it, that is a case where he would be guilty of manslaughter, because that is a failure to observe his duty and a use of the law of self-defence hastily. He must not forget that he is judge, jury, and executioner when he is sitting in that tribunal out in the woods or country. He is therefore required to comprehend what this law is. He is required to know what the facts are that confront him and to make a correct application of that law to these facts, and if he does not do that, when he might do it, he makes a mistake in that regard, and he would be guilty of manslaughter."

Having shown that premeditation may exist in the twinkling of an eye, the learned judge thus treats of the act of self-defence as involving, at least in kind, the deliberation of a judge, a jury, and an executioner. If the jury, thus admonished, believed the exercise of the right of self-defence involved the same deliberation as their own grave consideration of a verdict upon which a human life might depend, it is easy to see that they might well confound the distinction between such deliberation and instantaneous conclusions under sudden

attack, or in the presence of apprehended or imminent danger. The charge was open to the construction that, while premeditation may exist in a criminal sense upon the conception of an instant, the conclusion to kill in self-defence must be arrived at upon more serious deliberation, or it furnishes no excuse. If, in the language of the Court of Appeals of New York in *People* v. *Clark*, 7 N. Y. 385, " there be sufficient deliberation to form a design to take life, and to put that design into execution by destroying life, there is sufficient deliberation to constitute murder, no matter whether the design be formed at the instant of striking the fatal blow or whether it be contemplated for months;" then in the matter of self-defence, the deliberation of the slayer in respect of the greatness of the necessity to protect himself from death or great bodily harm, if material, would also be sufficient although the conclusion to kill was arrived at instantaneously. The swiftness of thought in the latter case would no more exclude the element of deliberation than in the former, and whether the act was excusable or not could only be determined by all the facts and circumstances disclosed by the evidence.

In short, whether or not a particular homicide is committed in repulsion of an attack, and, if so, justifiably, are questions of fact, not necessarily dependent upon the duration or quality of the reflection by which the act may have been preceded.

The gravest deliberation would not absolve under all circumstances, though it might mitigate the offence under some ; and if the facts justified the act, the extent of deliberation would be immaterial.

To enlarge upon the magnitude of the power of slaying in defending against an attack, as being a power which in itself would not be tolerated in the Chief Executive of the country or in the judge then passing upon the issues of life and death ; and to advise the jury to inquire, not into the existence of defendant's belief or the reasonableness of the grounds on which it rested, but into the character of the deliberation which accompanied it tested by the standard of that of the judge, the jury, and the executioner, in the discharge of their appropriate duties, manifestly tended to mislead. Nor does

this view impute a want of intelligence in the jury. They might find a verdict in disregard of the instructions of the court, but this is not to be presumed, and if that strict attention to judicial direction were paid which the due administration of justice requires, we are constrained to the conclusion that such instructions as those under consideration could not but have a decided influence upon their action.

As was said in *Allen* v. *United States*, 150 U. S. 551, we do not think that the doctrine is practicable which tests the question whether a defendant was entitled to excuse on the ground of self-defence, or exceeded the limits of the exercise of that right, or acted upon unreasonable grounds, or in the heat of passion, by the deliberation with which a judge expounds the law to a jury, or the jury determines the facts, or with which judgment is entered and carried into execution.

However improbable Hickory's story may have been, and however atrocious his conduct, he could not be deprived of making the defence he put forward, and these instructions of the court were erroneous as they stood unqualified.

The rule in relation to exceptions to instructions is that the matter excepted to shall be so brought to the attention of the court before the retirement of the jury as to enable the judge to correct error, if there be any, in his instructions to them, and this is also requisite in order that the appellate tribunal may pass upon the precise question raised without being compelled to search the record to ascertain it. And it is also settled that where several distinct propositions are given, and the exception covers all of them, if any one of them is correct, the exception cannot be sustained. The exception here is not obnoxious to objection as violating the rule in these regards. The trial judge could not have been in doubt as to the particular part of the charge objected to, and, as his attention was called to the matter before the jury retired, could have modified or withdrawn it, if he had thought it necessary to do so; and the portion excepted to is indicated with sufficient precision so far as this court is concerned. Nor did the exception embrace other than the specified statements objected to. Again, the exception was not to the omission of the court to

charge upon a particular point, in which case, in the absence of request that that should be done, it would not have been well taken, *Texas & Pacific Railway Co.* v. *Volk, ante,* 73, although, even in that view, the exception might be held equivalent to a request for the qualification ; but the objection really was to the giving of the instructions unqualified, and counsel signified out of abundant caution what in their judgment would remove their ground of complaint. We hold, therefore, that the point was sufficiently saved.

*Judgment reversed and cause remanded with a direction to grant a new trial.*

MR. JUSTICE BREWER dissented.

MR. JUSTICE BROWN took no part in the consideration and decision of this case.