# CHARLESTON.

## FLOWERS v. FLETCHER.

Submitted June 12, 1894—Decided December 15, 1894.

1. EVIDENCE.
    In a controversy over a disputed paper, evidence which tends to impeach the truth of the matter contained in such paper is admissible.

2. EVIDENCE—HANDWRITING.
    To render a person a competent witness to testify as to the handwriting of another, it is not sufficient to show the receipt of friendly letters purporting to come from such person alone, but

some admission or acquiescence equivalent to an acknowledgment that she was the writer of such letters must be shown on the part of such person, independent of their receipt and contents.

3. EVIDENCE—REVERSAL.

A judgment will not be reversed because of the admission of improper testimony plainly not prejudicial to a fair trial of the case.

JOHN BASSELL and W. SCOTT for plaintiff in error, cited Anderson's Law Dictionary, Title: "Seduction"; 33 W. Va. 40-57; 29 Gratt. 255; 31 Gratt. 855; Greenleaf on Evidence, Vol. 1, § 577; Anderson's Law Dictionary, word "Handwriting"; Rice on Evidence, Vol. 1, page 340.

DENT, JUDGE :

Plaintiff instituted an action of *assumpsit* against the defendant in the Circuit Court of Harrison county for breach of marriage contract. Defendant pleaded *non-assumpsit* and accord and satisfaction. Afterwards he withdrew the general issue, and the case was tried on the special plea, resulting in a verdict and judgment for five hundred dollars in favor of plaintiff. The defendant, not being satisfied, brings the case to this Court.

The motion for a new trial and the combination bill of exceptions and certificate of evidence are seriously open to the objections pointed out in the cases of *State* v. *Harr*, 38 W. Va. 58 (17 S. E. Rep. 794) and *Gregory's Adm'r* v. *Railroad Co.*, 37 W. Va. 606 (16 S. E. Rep. 819) and contravenes the rule laid down in the fourth syllabus of the former case, which is in these words: "To make available in the appellate court an objection taken during the trial to the admission of evidence, the point must be made and properly saved by some bill of exceptions. It is not enough merely to note the objection and exception in the certificate of evidence." It is true that the motion for a new trial is based on the grounds, as set out in the court's order, of the "rulings of the court during the trial in excluding certain testimony offered by the defendant, and permitting the introduction of certain testimony offered by the plaintiff;" but this is too general. See *Gregory's Adm'r* v. *Railroad Co.*, *supra*, and in

cases therein cited, and commented on in the opinion of Judge Brannon. During the progress of a hotly contested trial, innumerable exceptions are taken to the rulings of the court, depending entirely on the ignorance, experience, and ability of the lawyers engaged. Many of these are very trivial. Others may be of great moment, and the trial judge has the right to have his attention especially called to the points on which the parties rely, and not be required to go over the whole evidence and search them out for himself, or for the parties to be in a condition to base their motion on certain rulings in the Circuit Court, and then rely on entirely different rulings in this Court. While this is a case in which the rule could be applied, yet it is probably better to waive it, and decide the case on the merits, rather than give room for the complaint of a too strict enforcement of a rule, be it ever so efficacious.

In this case numerous exceptions are taken to the rulings of the court, both as to the admission and refusal to admit testimony. It does not appear whether any of these are waived; so the duty devolves upon the court of going over, reviewing, and weighing all these exceptions, to ascertain whether the defendant has been prejudiced thereby. The defendant's plea of accord and satisfaction is founded on a paper writing, in words as follows, to wit: "Received March 5th, 1892, of Jackson Fletcher, fifty dollars, in full of all claims, demands or rights of action, at law or otherwise, that I may now have against said Jackson Fletcher for breach of promise to marry, or that I may now have against said Jackson Fletcher to proceed against him, by virtue of the laws of the State of West Virginia, for the support and maintenance of any child with which I may now be conceived or may hereafter be delivered. It is expressly agreed between myself and said Fletcher that this writing is in no wise or sense an acknowledgment by him that he is the father of any child with which I have been or am now conceived, or that he has promised to marry me, but only because that I desire to relieve him of any charge of that kind that may be made because he has been in my company. Inaby Flowers, Seal. Luticia Flowers, Witness." Plain-

tiff filed a special replication, denying the execution of this paper and the receipt of the money as therein recited, under oath. The jury were impaneled to try the issue made upon this plea, and at the same time execute the writ of inquiry awarded.

The defendant objects, first, because the court allowed testimony to go before the jury tending to show that he, after the plaintiff became pregnant, furnished and wanted her to take medicine that would produce a miscarriage, and which she refused to take. He insists that this evidence was not admissible for any purpose, and only served to prejudice him in the minds of the jury. It is possibly true that this evidence was not admissible in aggravation of damages and the admitted promise of marriage and seduction, but it was admissible to contradict the truth of the paper on which the defendant was relying, and thus tend to sustain the non-execution of the paper by the plaintiff. While the plaintiff, by his plea, admits the promise of marriage, he files and relies on, in satisfaction of it, a paper in which the plaintiff is made to admit that no such promise was ever made, and the defendant was not guilty of her seduction, nor the father of her unborn child, and for which truthful admission on the part of the plaintiff he is willing to pay her the sum of fifty dollars. Thus, he is made to appear before the jury, generous to a fault, and a badly-treated man. There is no better way to discredit a paper than to show its falsity. And the fact that defendant wanted to destroy the fruit of his unbridled lust was proof positive that the paper was a written falsehood. The withdrawal of his plea of *non-assumpsit* was, in legal effect, an admission of his promise to marry, and yet he still had the denial of that promise before the jury in his plea of accord and satisfaction, contained in the paper filed as a part thereof. No doubt, that plea was withdrawn for the very purpose, if possible, of preventing any evidence being introduced of his duplicity, and thus prejudicing him in the minds of the jury, contrary to his written release and certificate of character.

Defendant next objected to the evidence of Truman Gore. His testimony was to the effect that he was present at the

parties, is competent to testify as to the handwriting of his home of defendant's mother while the plaintiff was living with her, and, when he went to leave, defendant invited him back, and said, when he came back he (defendant) expected to have a housekeeper of his own, but mentioned no name. This undoubtedly showed that defendant was contemplating matrimony at the time, but how that could prejudice his case it is hard to perceive, especially when, by his pleading, he admits that his mind was running in that direction. His plea appears to have been for the purpose of preventing any proof on this subject, but how was the jury in such a case to execute the writ of inquiry and arrive at the damages. They were entitled to full information, to enable them to reach a proper verdict. This language was used in the presence and hearing of plaintiff, to carry out his deceitful conduct towards her, and is in full accord with his wicked scheme to satisfy his uncontrolled passions, and then cast aside his deluded victim.

The next two objections are to the refusal of the court to admit the testimony of the witnesses A. W. Barnes and John Johnson, as to the genuineness of the signature to the paper in controversy. The law is that a witness who has any personal knowledge of a signature in controversy, however slight, has the right to give his opinion, and the weight of that opinion is a question for the jury, and not for the court. A witness who has seen a person write but once, and then only his abbreviated signature, may testify regarding the same; or if he has seen a signature admitted by the owner to be genuine. *Rogers* v. *Ritter*, 12 Wall. 322; *Pepper* v. *Barnett*, 22 Gratt. 405; *Cody* v. *Conly*, 27 Gratt. 313; 1 Greenl. Ev. § 577. But he must have some knowledge, and the mere fact that he has received letters purporting to be from the person whose signature is in controversy is not sufficient, unless there has been some admission or acquiescence equivalent to an acknowledgment on the part of the supposed writer, other than the letters themselves, that said letters are genuine, and in the handwriting of the person from whom they purport to come. A person who has had business correspondence with another, acted upon by both

correspondent, although he may never have seen him write. But where the letters have no relation to business transactions, but are letters of mere friendly or polite intercourse, some acknowledgment of handwriting, in some way other than the letters themselves, on the part of the supposed writer, must be shown. The knowledge of the witness must be founded in some other means than the receipt and contents of the letters. 9 Am. and Eng. Enc. Law, 271. The testimony of the witness Johnson was to the effect that he had known plaintiff for fourteen or fifteen years; did not know whether he had ever seen her write; corresponded with her about fourteen years ago, received about a dozen letters in answer to his own, with her name signed to them; had received no letters recently; had some of the letters with him. The question was then propounded to him: "From your knowledge of her handwriting, derived from having received letters from her, would you know the plaintiff's signature?" The court refused to allow this question to be asked, and rightly so, for the law answers this question that the witness could not know her handwriting from the mere fact that he had received letters purporting to come from her. His knowledge must be extraneous to the letters, sufficient to raise a presumption that the letters were not only from, but written by, the person whose name was signed to them.

A. W. Barnes testified that he was acquainted with the plaintiff; had known her since 1879; corresponded with her; received letters from her about four years ago, not all in the same handwriting, and were from different places; talked with her afterwards about the contents of the letters. The question was propounded to him: "State from your knowledge of her handwriting, derived from letters received from her, you believe the signature, 'Inaby Flowers,' to this paper, is plaintiff's handwriting." This question was bad, for the same reason as the one propounded to the other witness, and the court properly sustained plaintiffs objection to it. But there was still a further objection to this witness, and that is that he states the letters were in different handwritings. His evidence would therefore not have been admissi-

ble, unless he had shown that the plaintiff had pointed out and acknowledged which of the letters were in her handwriting; for it is not the receipt of nor the sending of the letters, but the handwriting, that is in controversy. A cashier of a bank who had, in the course of business, paid out a great many checks drawn on the bank, was held to be incompetent to testify as to the drawer's handwriting, because among them were some forged checks, which he had honored and paid along with the rest. *Brigham* v. *Peters*, 1 Gray, 139. Having received various letters in different handwritings purporting to come from the same person, how was the witness to know, never having seen her write, which of the letters were in her handwriting? And, not knowing this, how was he to acquire from them such knowledge of her handwriting as to make him competent to testify concerning the same? To ask the question is to answer it.

The next objection urged is that the court admitted the testimony of Samuel Davis that about the 1st of March, 1892, wishing to employ plaintiff to live with him, he sent a boy to her father's house for her, and he returned with the information that she was not there. This was certainly improper hearsay testimony, but it amounted to nothing, and could not possibly have had any weight with the jury. About the 1st of March is very indefinite, and would mean any time from the 1st to the middle of the month, and that she was absent from home does not mean that she had gone to Moundsville or any place particularly for any time. It is clear that this evidence did not affect the result in any manner, nor was the defendant prejudiced thereby. To reverse a judgment on account of the admission of objectionable testimony, there must be at least a doubt of its prejudicial character towards the exceptant. *Taylor* v. *Railroad Co.*, 33 W. Va. 40 (10 S. E. Rep. 29).

The next objection is to the refusal of the court to admit the testimony of John T. Williams that the defendant showed him the paper in controversy on March 4, 1892, and got some money changed, and said he was going over to the house of George Flowers to pay the plaintiff money, and have her sign the paper. This was strictly hearsay testi-

mony, and not admissible as part of the *res gestae*, but has the appearance of being manufactured by the defendant. A man in ordinary circumstances who is going to pay another fifty dollars will hardly need to get money changed for the purpose. Even fifty dollar bills are rare in the country. If he was only going to pay her eleven dollars, as testified to by the plaintiff, he might need change, but hardly to pay the larger sum.

The defendant's last assignment is founded on the refusal of the court to set aside the verdict and grant him a new trial. The case, in short, is to the following effect: About the 1st of March, 1891, the plaintiff, a humble country girl, went to live with defendant and his mother, he being a widower. He immediately began to show her attention, and, under the promise of marriage, seduced her, telling her at the same time: "It did not matter if they did do that way, as they were going to be married anyhow. Others had done so, and people had thought nothing the less of them." He continued this treatment of her until she became pregnant. Then he renewed his promises to marry her, and continued them up until February, 1892, when he finally refused to marry her, as he had become engaged to another. Admitting this to be true, defendant claims to have obtained from her whom he so shamefully treated, for the sum of fifty dollars paid, the certificate of innocence filed with his plea in this case. The jury, sustained by a decided preponderance of testimony, found against him on this plea, and assessed the plaintiff's damages at five humdred dollars. How the jury arrived at such sum from the evidence it is hard to tell, unless, owing to the defendant's pecuniary circumstances and inability to pay, a verdict of five hundred dollars was considered equally as valuable as one for five thousand dollars. Our law affords no adequate remedy for wrongs of this character, and this action, almost obsolete, is seldom re- sorted to except by the poor and friendless. The ordeal of such a trial is too great for the sensitive natures of the injured female and her relatives, who shrink from having her shame exposed to the idle and vicious gaze of the miserable hangers-on of a noisome court room. Owing to the impo-

tency of our law, fathers and brothers, and even the betrayed, in her desperation, have too often had to assume the unwelcome role of self-appointed executioners, and demanded immediate reparation or the life of the seducer. Killing under such circumstances has invariably been excused by the juries of our own and all other countries as justifiable homicide, the law of the land to the contrary notwithstanding; thus vindicating the righteousness of the most ancient of all laws on this subject, as promulgated by the greatest of all human lawgivers. His penalties, in the light of modern civilization, appear extremely harsh, but, if they were now the law of the land, virtue would be exalted where none now exists, and the brazen, polished libertine, whose unfortunate and heartbroken victims go to swell the ranks of crime, and fill our houses of infamy, would no longer be held in check his unhallowed passions in obedience to the dread of punishment in some degree at least commensurate with his offense.

Of the judgment in this case the defendant has no reason to complain, and it is therefore affirmed.