Lonnie GLASGOW, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12474.

Criminal Court of Appeals of Oklahoma.

July 16, 1958.

Lewis F. Oerke, Lawton, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

PER CURIAM.

The plaintiff in error, Lonnie Glasgow, was charged by information filed in the district court of Cotton County with the crime of second degree forgery, was tried before a jury, convicted and his punishment fixed at confinement in the State Penitentiary for a period of three years.

For reversal four propositions are advanced in petition in error and brief.

 It is first contended that the court erred in overruling the defendant's motion for a change of venue. The record discloses that the motion was supported only by two short affidavits, with wording the same. The county attorney responded to the motion and filed a number of counter affidavits to the effect that the accused could receive a fair and impartial trial in Cotton County. This court has often said that the granting or refusing of a change of venue is a matter resting within the sound discretion of the trial court to be

disposed of in furtherance of substantial justice; and action by the trial court will not be disturbed on appeal, unless there is an abuse of discretion. Rucker v. State, 88 Okl.Cr. 15, 195 P.2d 299, 199 P.2d 221; Fry v. State, 91 Okl.Cr. 326, 218 P.2d 643.

For a proper consideration of the remaining issues, we shall summarize pertinent evidence.

 There has been interposed the question of the proof of the corpus delicti. The general rule, of course, elementary and well settled, is that a defendant cannot be convicted upon the extra-judicial statements of a defendant, unless the State proves in some way the corpus delicti, independent of the defendant's admission. The meaning of the term "corpus delicti" is nothing more than the substantial fact that a crime has been committed. Black's Law Dictionary, 3rd ed. This was shown by the testimony of three witnesses, as follows:

J. T. Ward, hardware dealer of Walters, testified that he was acquainted with one Travis Brown and that on or about April 21, 1956 Brown came in his store and wanted witness to cash a check. He said Brown told him the check was for labor, and that he knew Brown and the man the check was drawn on, so he cashed it. He said that Brown got some small items, but mostly cash. He further stated that Brown endorsed the check in his presence. Witness identified the check, which was drawn on the First State Bank of Temple, Oklahoma, dated 4-21-56, numbered 37, made payable to Travis Brown in amount of $14.50, and with notation: "Labor—Burner Clean", and was purportedly signed by Lee Williams. It bore the endorsement of Travis Brown and J. T. Ward, and was returned by the Bank to Ward with the notation "No A/C". The check was received in evidence as State's exhibit 1. Witness said that the check was never paid, and was returned to him as "hot".

Edward Brockert, officer in the First State Bank of Temple, next testified. He said that he had seen State's exhibit 1 around April 25, 1956, when it was present-ed to his Bank through the regular course through Oklahoma City, and that they returned the check through the clearing house as the purported maker, Lee Williams, had no account with his Bank.

Lee Williams testified that he resided in Temple and had been a resident of Cotton County for about twenty years. He was shown State's exhibit 1 and denied ever having seen it before, and specifically denied that he made out or signed the check in question. He further said that he carried no account at the First State Bank of Temple. He said that he knew nothing about the check and had never authorized anyone to sign his name to it. He admitted on cross-examination that he knew the payee in the check, Travis Brown, and that he had purchased plumbing supplies at Ward's Hardware, Walters. He said that Travis Brown had done some work for him during cotton-pulling time about five years in the past, but had never cleaned any burner for him.

██ The evidence recited was sufficient to show the substantial fact that a forgery had been committed, and independent of any statement by Travis Brown, payee in the check, or of Lonnie Glasgow, the man charged with having written and signed the name of Lee Williams to the check.

This brings us to the proposition that the court committed reversible error in the admission in evidence of a photostatic copy of a letter purportedly written by the defendant, and that was used as an examplar or standard for comparison. This was State's exhibit 2. The original letter from which the photostat was made was also admitted into evidence as State's exhibit 3.

We shall now consider the evidence supporting the admission of this photostatic copy of the original letter purportedly in the handwriting of the defendant and in which he had applied to the State Hospital at Vinita for a job.

Hubert Bartlett testified that he lived at Ardmore, that he was an agent for the Oklahoma Crime Bureau, that he had

met the defendant Lonnie Glasgow and pointed him out in the court room. He said that he arrested defendant in Walters and took him to the sheriff's office. He said that he had a talk with the defendant but that prior thereto he advised defendant that he did not have to say anything and that what he said might be used against him or for him, and that he had a right to call an attorney. Thereupon, he said that he showed defendant State's exhibit 2 and that defendant told him that he wrote the letter. At this point, counsel for the defendant interposed the following objection:

"By Mr. Oerke: I object to any reference to this letter until there is some explanation as to how it got into this man's possession. It seems to be a letter through the United States mail. Until such time as there is some explanation as to how it came into his possession, I object to any reference to it.

"By the Court: Did you see him write it? A. No, he said he wrote it."

The court then ruled that the photostatic copy of the letter might be received in evidence as an example of defendant's handwriting.

Counsel then interposed the further objection:

"To which we object, further, because it's self-incriminating, Your Honor, the letter or something obtained from the United States mail, because at this time there is no showing as to how he got it."

That objection being overruled, counsel said:

"I want to further object to that. That's a photostat. The original is the best evidence."

Witness went on to say that the reason he did not have the original letter from which the photostat was made at the time he talked to defendant, was that it was in possession of the State Crime Bureau, Oklahoma City, and was being examined by Mr. Travis, their handwriting expert, for comparison with certain other checks. Witness was shown a letter marked State's exhibit 3, but which had not yet been offered in evidence, and identified such letter as the original from which the photostatic copy (State's exhibit 2) was made, and that he was present and saw the photostatic copy made, shown to later have been exhibited to the defendant. The court then received the original letter in evidence, whereupon counsel objected on the ground that: "There has been no showing whatever where this came from. This exhibit 3 was never exhibited to this defendant."

Neither counsel nor the defendant objected that the photostat and the letter from which the photostat was said to have been made, were not exactly the same, so that the court overruled the objection.

On cross-examination it was developed by defense counsel that the State Crime Bureau learned from sources in Walters about the letter and that their Claremore agent went to the State Hospital at Vinita and obtained the letter.

David Hooper, deputy sheriff of Cotton County, testified that he was acquainted with the defendant and pointed him out, and stated that Hubert Bartlett of the Oklahoma Crime Bureau accompanied him to arrest defendant in June, 1956, and they brought defendant to the county jail. He said that he was present when Mr. Bartlett questioned defendant, and that he heard Mr. Bartlett explain defendant's rights to him before he questioned him. Witness was then handed State's exhibit 2 and was asked if defendant was questioned concerning that letter, and he answered that defendant Glasgow stated that he wrote the letter. On cross-examination witness was asked if defendant said anything about writing on that (photostatic) paper or not. Witness answered: "He said, 'I don't remember writing on paper that looked like that', but then he finally admitted writing the letter."

Robert L. Travis testified that he was Questioned-Document Examiner for the Department of Public Safety, Division of Investigation, and had been for about fifteen years. He then went on to state his qualifications for the work, with no objection interposed as to qualifications. He was shown State's exhibits 2 and 3, being a photostatic copy of a letter and a letter, and stated that exhibit 2 was a photostatic copy of exhibit 3, the original letter which he held in his hand. He testified that he made the photostat from the letter. Witness was then handed State's exhibit 1, and also State's exhibit 3, and asked if he had examined such exhibits for the purpose of comparison, and he stated that he had. He said in answer to a question: "After examining and comparing the handwriting I arrived at the opinion that both were written by the same person". He then went on to point out similarity of characteristics of letters in the letter, and other matters that supported his conclusion. He said that in his opinion the entire face of State's exhibit 1, the check, was written by the same person, including the signature, but that the endorsements were made by different persons.

■ Under the peculiar facts in the within case, we are of the opinion that both the photostatic copy of the letter purportedly written and signed by the defendant Lonnie Glasgow, and the letter from which the photostat was made, were admissible in evidence. No one would question the admission of the original letter. State's exhibit 3, if it had been shown defendant and he had admitted writing it. The authorities support the rule as stated in 41 A.L.R.2d 596, that "Both in jurisdictions in which establishment of standards for comparison of handwritings is a matter of statute, and in jurisdictions where this is a common-law issue, it is agreed by the courts that if a party against whom a handwriting standard is to be used admits the genuineness of the standard, further proof of genuineness is unnecessary." A long line of cases from federal and state courts are cited as supporting the rule.

■ The Supreme Court of Oklahoma has held that generally, proof of genuineness of person's writing or signature may be made by comparison with other writings which are admitted or proven to be genuine specimens of same person's handwriting and submitted to the court and jury for determination of such question by their own observation and judgment. See Eckles v. Busey, 191 Okl. 644, 132 P.2d 344. See, also, paragraph 5 of the syllabus in Burns v. State, 72 Okl. Cr. 409, 117 P.2d 144, 145, where this court said:

"Where an issue is raised as to the genuineness of a written instrument or of a signature to an instrument, proof of the genuineness of the writing or signature may be made by a comparison with other writings of the same person which are either admitted or proved to be genuine specimens and which writings may be submitted to the jury to enable them to determine the question by their own observations and judgment."

The admission does away with proof of a person or persons seeing the accused write the standard or perhaps proof from a person receiving the writing in reply to a communication from such witness.

The argument that the admission from the defendant was a qualified one in that he did not remember writing the letter, State's exhibit 2, on the kind of paper comprising such exhibit, is without force, in that the paper was "photostatic" paper, and not only was there evidence from the witness that exhibited the photostat to the defendant, that he witnessed the making of the photostat from the original letter, State's exhibit 3, but we must assume that before any of the exhibits were admitted into evidence by the court that defendant and counsel had opportunity to examine and compare such exhibits, and no objection was interposed suggesting

variance, neither did the defendant offer any evidence in denial.

By reason of the above conclusion, the general principle of law cited by defendant and taken from 20 American Jurisprudence, Evidence, Sections 422–428 and from 9 A.L.R. 978 and 988, while correct general statements of the law, concerning proof of the genuineness of the exemplar, the best evidence rule (20 Am.Jur. §§ 422–428) is not applicable.

The case of University of Illinois v. Spalding, 1901, 71 N.H. 163, 51 A. 731, 62 L.R.A. 817, 827, interposed in behalf of defendant is not adverse to the conclusions that we have reached, by reason of the admission of the defendant. That case held (headnote 1):

"Writing otherwise irrelevant and not admitted to be genuine may be admitted in evidence for comparison with disputed writings in the case, if they have been found to be genuine

by the presiding judge upon clear and undoubted evidence."

It is true that in the Spalding case the court wrote a lengthy opinion by reason of the overruling of several of its previous decisions, and did discuss the ancient ecclesiastical law of England, the common law of England and made a quotation from a civil law statutory provision which read:

"By the civil law it was provided that *'the writing must either be of a public nature, such as signatures made before a notary or judge, etc., or papers written or signed in some public capacity; or, if private papers, they must be admitted, in the case, by the party to whom they are attributed, to be of his own handwriting. A previous admission of them or previous proof will not make them admissible.'*" (Emphasis now supplied.)

But this was quoted merely by illustration, and not as being the then law (1901) of England.[1]

---

1. Chief Justice Fuller of the Supreme Court of the United States, in Hickory v. United States, 151 U.S. 303, 14 S.Ct. 334, 335, 38 L.Ed. 170, 171, discussed the law of England, which may clarify the quotation from the New Hampshire case, as follows:
 "According to the general rule of the common law, the genuineness of disputed handwriting could not be determined by the court and jury by comparing it with other handwriting of the party, but among the exceptions to the rule was that if the paper admitted to be in the handwriting of the party or to have been subscribed by him was in evidence for some other purpose in the cause, the paper in question might be compared with it by the jury, (Moore v. United States, 91 U.S. 271 [23 L.Ed. 346]; Rogers v. Ritter, 12 Wall. 317 [79 U.S. 317, 20 L.Ed. 417];) and this with or without the aid of witnesses. * * *
 "By acts of parliament it is now provided in England, as *'to all courts of judicature, as well criminal as others,' 'that comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine, shall be permitted to be made by the witnesses; and such writings and the evidence of witnesses respecting the same, may be submitted to the court*

and *jury as evidence of the genuineness, or otherwise of the writing in dispute.'* 17 & 18 Vict. c. 125; 28 & 29 Vict. c. 18.
 "Under these statutes it has been decided that any writings, of the genuineness of which the judge is satisfied upon the proof, may be used for the purposes of comparison, although they may not be admissible for any other purpose in the cause, (Birch v. Ridgway, 1 Fost. & F. 270; Creswell v. Jackson, 2 Fost. & F. 24;) and that the comparison may be made either by witness, or, without the intervention of any witnesses at all, by the jury themselves, (Cobbett v. Kilminster, 4 Fost. & F. 490; 1 Whart. Ed. § 712.) But, in the absence of statute, papers irrelevant to the issues on the record were held not receivable in evidence at the trial for the mere purpose of enabling the jury or witnesses to institute a comparison of hands. Bromage v. Rice, 7 Car. & P. 548; Doe v. Newton, 5 Adol. & E. 514; Griffits v. Ivery, 11 Adol. & E. 322; 1 Greenl. Ev. § 580. The danger of fraud or surprise and the multiplication of collateral issues were deemed insuperable objections, although not applicable to papers already in the cause, in respect of which, also, comparison by the jury could not be avoided."

The evidence that we have already recited, we hold, was sufficient to corroborate the evidence now to be summarized and pointed out, of Travis Brown, payee in the check with which defendant was charged with uttering, and this will dispose of defendant's fourth proposition to the effect that there was not sufficient corroboration of the testimony of Travis Brown.

■ Travis Brown stated that he lived six miles south and two miles east of Walters and was acquainted with Lonnie Glasgow, the defendant. He stated that he could not read, and could only write his name. He was handed State's exhibit 1, the check, the basis for the prosecution, and he stated that he had seen it before and that he had endorsed his name on the back, and that Mr. J. T. Ward had cashed it. He said that he was unable to read the names on it other than his own. He said that Lonnie Glasgow wrote the check there in Walters in the telephone office, which was about half a block from the Ward Hardware store. That Glasgow wanted him to get him some nylon cords and fish hooks. Glasgow, it was shown, lived out at the city lake. He said that he presented the check to J. T. Ward, got the nylon cords and fish hooks, and the difference between the $14.50 check and the price of the merchandise in cash, and gave the merchandise and the cash to the defendant Glasgow and that Glasgow then set him up to some beer at Fannie's beer joint. He denied getting any of the money from the check, or knowing that the check was purportedly signed as payor by Lee Williams. He said that he did not know, being unable to read, that the check was made out for labor and burner cleaning. He said that Mr. Ward asked him if he had been working for a Mr. Worsham, cleaning burners, and that he told him he had, because he had in fact worked for Mr. Worsham, cleaning a burner. He said that he did not remember Mr. Ward asking him about Lee Williams. He understood him to ask where he had been working, and he told him at Temple.

■ As indicated, we consider this evidence ample corroboration by other evidence recited, and all sufficient to support the verdict and judgment.

At this point we consider defendant's third proposition, to the effect that "The court erred in refusing to admit certain evidence to be shown by the cross-examination of the witness Travis Brown, as to the passing of other insufficient and fraudulent checks, the said Travis Brown being a witness for the State, and himself a confessed criminal."

■ On cross examination counsel had persisted in asking State's witness Brown as to alleged offenses which had no connection with the transaction involved in the within case. The questions were not as to any former conviction or convictions, but to alleged acts and charges. The trial court went much too far in permitting this line of questioning. See Pressley v. State, 71 Okl.Cr. 436, 112 P.2d 809, and Porter v. State, 8 Okl.Cr. 64, 126 P. 699. In the latter case this court in paragraph 3 of the syllabus said:

"It is improper to ask a witness if he has ever been indicted, arrested, or imprisoned, before conviction, for any offense whatever. Where such question is asked, it should be promptly excluded, with a rebuke to the lawyer asking the same; and if the question is repeated it should be treated as a contempt of court and punished as such."

We note that counsel for his efforts elicited from witness that defendant had also given him other bad checks for cashing besides the one involved herein. For the State to have developed such fact would, of course, have constituted error.

It is our conclusion, therefore, that the opinion heretofore rendered on December 18, 1957 should be and the same is withdrawn, and that the judgment appealed from must be, and the same is affirmed.

We are of the further opinion that because of the long delay encountered in processing this matter for which the defendant is not accountable, the demands of justice require a modification of the judgment and sentence of three years to two years in the State Penitentiary, and it is so ordered.

NIX, Judge (dissenting).

The above opinion was rendered by this Court Dec. 18, 1957. A petition for rehearing was lodged within due time by the Attorney General, pointing out that a portion of the record had been misinterpreted by this court and with that your writer agrees. It appeared from the Attorney General's brief that the state had introduced a photostatic copy of the comparison handwriting letter instead of the original. After a careful study of the record it will be noted that the original was later introduced into evidence as Exhibit 3. The original letter does not appear as an exhibit in the transcript of the proceedings. The Attorney General informed the court that one of the exhibits was a photostatic copy of the original substituted by the court reporter. This was indeed confusing to this court. The court reporter should only make substitutions by order of the trial court. However, it will be noted from the original opinion that one of the grounds for reversal was the fact that the state fell short in proving the comparison instrument to be the genuine handwriting of the defendant. The only evidence presented in this regard was the testimony of officer who said defendant, when presented a photostatic copy of said writing, acknowledged his signature.

It is well to bear in mind that this was at the time of his arrest, a long while before trial. It was stated in said opinion that this extra-judicial statement by defendant to the officer at the time of his arrest, standing alone is not sufficient. To so hold would in the opinion of the writer open an avenue of fraud in civil action as well as opportunity for unjust conviction in criminal action. The Attorney General has had ample time to overcome the rule laid down in University of Illinois v. Spalding, 71 N.H. 163, 51 A. 731, 734, 62 L.R.A. 817, 827, but as yet no authority to the contrary has been presented. In the above case while discussing handwriting for comparison, the court said:

"the writing must either be of a public nature, such as signature made before a notary or judge, etc., or papers written or signed in some public capacity, or if private papers, they must be admitted, *in the case,* by the party to whom they are attributed, to be of his own handwriting. *A previous admission of them or previous proof will not make them admissible.*

With proper diligence it should be a simple task to properly identify the comparison writing as that of the defendant by competent testimony.

Your writer is of the opinion the petition for rehearing should be denied.