Nott, J.,
delivered the opinion of the court:
This is an action brought under the Abandoned or captured property aet, to recover $100,000 for one hundred and thirty bales of cotton captured at Wilmington, North Carolina.
It is one of those extraordinary cases where evidence apparently truthful and incontrovertible is arrayed against evidence apparently truthful ’and incontrovertible; where the facts established on the one side are utterly irreconcilable with the facts established on the other side; and yet where it strains our credulity to believe either statement to be false, notwithstanding that we believe the other to be true.
The claimant is an English woman, who resided during the rebellion at Wilmington, North Carolina. She shows that while the war existed she mingled but little with southern citizens, and was reputed to be friendly to-the United States. Her chief witnesses are our own military and naval officers. Among them is the “medical director of the expeditionary force under General Terry.” He says :
“A few days after the occupation of Wilmington wre received at the North-East River about four thousand hospital patients, United States prisoners and exchanged prisoners, as appeared on our rolls; we called them returned prisoners. We were very short of hospital stores of all kinds, not being prepared for this great influx. After I returned from Wilmington from North-East River, Hr. Merriweather, who had charge of one of my hospitals, informed me that a lady had some hospital stores which she desired to turn over to the hospital for the benefit *425 of the returned prisoners. I went with him to lier house, and it was Mrs. Medway, the claimant. She then and there gave me some medicine and medical stores, all that she had, which were taken away by Dr. Merriweather; she stated to me that she wished to do something for the hospitals, and that she •would be able to do more, and which she afterward did; this was the commencement of my acquaintance with the lady. I had supervision of that department to the 6th of October, A. D. 1865; our headquarters was**at Ealeigh, although I was frequently at 'Wilmington after going from North-East Eiver to Wilmington, as before referred to. I remained at Wilmington about two weeks, and during these two weeks Mrs. Medway was daily at the hospital and rendering assistance and supplies. This benevolence of Mrs. Medway was extended, as by the reports of the surgeons, up to the time of the breaking up of the hospital, about three months later.”
Again, the claimant has called as a witness the commanding naval officer on the Cape Fear Eiver immediately after the capture of Wilmington, and he testifies:
“ One of my officers on the Lenapee, since deceased, reported to me that during the war he wfith many others was captured near New Berne, North Carolina, and while waiting at the Wilmington, North Carolina, depot for transportation to a southern prison,' many of them wounded and sick, and all in a half-starved condition, they were surrounded by a large crowd of insolent- rebels, who refused to give them food or refreshments of any kind, when the plaintiff discovered them, and, in opposition to the wishes of the crowd and their threats of personal violence, purchased a large quantity of provisions and gave them to the Union prisoners. This report was afterward, verified by citizens of Wilmington, North Carolina.
“ I know of her giving large quantities of medicines and provisions to the Union sick, wounded, and distressed, and that she did all in her power in behalf of the United States during my stay in the Cape Fear Eiver.”
' “ Do you know of her having given aid or assistance to any wounded United States soldiers, or those who -were prisoners of war ?
“I do know of her having given aid or assistance to the wounded and sick soldiers and officers of the United States to the utmost extent of her ability and means. Three or four *426 thousand side prisoners from Columbia, South Carolina, and Andersouville, Georgia, arrived in the hospitals of Wilmington, afflicted with various contagious and infectious diseases. She administered to them in every way in her power, and was untiring in her attendance upon them, freely risking her life in the cause. For months she received into her house sick soldiers and officers, gave them all the comforts o.f a home, attended them day and night till they were sufficiently convalescent to return to duty. On one occasion she heard that a Union soldier was in a house near the one she occupied; she had him immediate! y brought to. her house, where she administered every care and comfort that could be given, until the soldier was sufficiently restored to be sent north. Both he and many others, I believe, are indebted to her for their lives. She continued her indefatigable care and attention to the Union sick so long as any remained to care for, and long after the failure of her own health, which was induced by her zeal for others, and from the effects of which I fear she will never recover. I further know that her efforts in behalf of the United States caused the loss of nearly all her personal friends in Wilmington in any way favorable to the rebel cause.”
So marked and meritorious were these services that the .young naval officers at Wilmington paid to Mrs. Medway the compliment of a serenade. Finally, after the war was over, Mrs. Medway was so shunned by the disloyal society of Wilmington that she was compelled to move to Illinois, where she still resides. These facts, coupled with the more direct testimony of other witnesses, certainly constitute a strong case of circumstantial evidence perfectly consistent from beginning to end, and leading but to one conclusion.
Leaving the chain of circumstantial evidence unbroken by the contradiction of a single witness, the defendants produce and offer in evidence the following letter:
“ Private.] u WilMing-ton, North Carolina,
“ February 10, 1865.
“Dear Sir: On the 2d of January I wrote to you making an offer of service, which, however presumptuous it might have appeared, was the result of deliberation, and an unfeigned desire to benefit our cause. Personally I could hope for no gain from it. If I choose to return home, nothing need *427 prevent; therefore it was 310 stepping-stone to that object. A voyage at this season, combining separation from the larger part of my family here, whom I should leave exposed to I know not what perils, could only be undertaken for reasons of the very gravest import. Letters which I had recently received, questions directly and indirectly asked, inquiries made and information sought through me, all urged me to lay my ideas before you. No reply to my letter ever reached me, and in answer to a dispatch on the subject I stated that I was in ignorance, but professed entire willingness to do what might be considered best. It is now too late for any step of the kind anticipated by me, and I only Arate now to tell you that should this town fall into the enemy’s hands, I will always be ready to perform' any service you may desire. Services have been rendered by other women, which I could not do — I mean the manner of rendering them; but that which can be asked of courage, steadfastness of purpose, and a humble but sure reliance on the All-Father, who is himself leading us.through this via ■orusis, that I can and Avill do.
“The day is very dark; here rve especially feel it to be so; but I think light is daAvning in the East. If we Avill only be firm, only hold out to the end, knowing that Adctory must come at last, all will be well. I cannot think how any can falter. I, r\dio am, so to speak^but a stranger, feel our cause the very life and breath of my life, wonder how a southern-born heart can eA"er hesitate. When these deep Avaters shall be safely passed, Ave will, no doubt, stand on the brink and shudder at their depth, but we Avill thank God, avIio gives us strength to.fight the good fight to this end.
“ There is no need to repeat Avhat I said before. I shall be at all times and in all places ready to do Avhat you appoint; these are words, but the proof Avill be forthcoming.
“ Those Avlioin I thought most faithful here are dropping off, one by one, waiting and hoping for the advent of the enemy as a means of sparing them some privation. . It is these shadows that darken the horizon to me, and Ealeigli is a nest of traitors !
“ I am so sorry I could not have seen you, tor I have much to tell, and do not dare to Avrite, but it is now too late. I pray earnestly that you may lnum strength to bear the burden and heat of this fervid day, your reward being the independence of *428 this people, who, however they flag- and falter now, have certainly sustained themselves against the most terrific odds and most vindictive adversary on record.
“With the deepest respect, yours, very faithfully,
“LOUISE 0. MEDWAY.
“ His Excellency Jeeeetison Davis, <&e., &o.”
The admission of this letter in evidence presents an interesting and, in this court, a novel question of law. It is produced for the first time upon the trial'; no testimony is offered to prove the handwriting; it is not shown to have been issued or uttered by the claimant, nor is a legal explanation given as to how it came to the .possession of the defendants. But they, relying upon the original petition of the claimant, verified by her in person, and the signature thereto, admitted to be in her own handwriting, have asked the court to make comparison of handwriting, without the intervention of witnesses, and, if found to be the claimant’s, to admit the letter in evidence.
The law officers of the government also have excused their seeming neglect in not having proved the signature when taking testimony for the trial, by stating that the letter but recently came to their knowledge, and that taking testimony to prove it would delay the trial of the case. The court has tendered a continuance to the claimant, (which was declined,) and, upon consideration, has made comparison of the handwritings, and admitted the letter in evidence.
The admission of this letter in evidence is not to be confounded with that practice -which prevails in some States of allowing witnesses to testify as to handwriting whose knowledge is but opinion, resting on comparison alone. It comes in under a different rule, resting upon a distinct principle. Undoubtedly, under the rule of the common law, a witness can only testify of handwriting from knowledge, and his knowledge must have been foreobtained, either from having seen the party write or from having, through correspondence, acquired a knowledge of his writing. Undoubtedly that rule of the common law prevails in nearly every State, and has been declared by the Supreme Court to be the rule of courts of the United States. But there is another rule. Comparison of handwriting-may be made by courts and juries without the intervention of witnesses, if the comparison be restricted to established writ *429 ings previously and properly in the case for other purposes, and not put in lor the more purpose of comparison. It is a rule which has been so little resorted to that in this country it is almost unknown. Although, stated by Phillips, (4 Am. ed., p. 615,) and spoken of by Greenleaf, (sec. 578,) yeti have noticed hut two American decisions which refer to it understanding^, (Van Wyck v. McIntosh, 14 N. Y., 439; Doe, dem. Henderson, v. Roe et al., 16 Ga., 521;) though there are others where it is confused with comparison by experts. (Hicks v. Person, 19 Ohio, p. 426 ; Bowman v. Sanborn, 5 Fost. N. H., p. 87; 21 Vt., p. 256.) In no American case that I know of has it been expressly overruled, though there is one where a State court in apparent ignorance of it held that it was error to show any writings to the jury, whose duty (so it was said) is to hear evidence and not see it.” (Outlaw v. Hurdle, 1 Jones’s Law R. N. C., p. 150.) The non-usance of the rule in this country leads me to examine its history in England. •
What may be termed the leading case Avherein comparison of handwriting was submitted to the jury is that of Allesbrook v. Roach, (1 Esp. R., p. 351,) where Lord Kenyon at nisi prius said: u Some judges have doubted of the policy of that rule of evidence respecting the allowing of thee'jury to judge by comparison of hands, because often at a distance from the metropolis the jury are composed of illiterate men, incapable of drawing proper conclusions from such evidence. Hor my part I have been ahoays inclined to admit it, and shall do so in this case.” This was in 1795. Four'years before that trial Lord Kenyon is reported by Mr. Peake to have said in another case at nisi prius, “ Comparison of hands is no evidence. If it were so, the situation of a jury who could neither read nor write would, be a strange one ; for it is impossible for such a jury to compare the handwriting.” (Macferson v. Thoytes, Peake N. P., 20.) And the decision in Allesbrook v. Roach is manifestly doubted by Peake in his work on Evidence, (2d London ed., p. 105,) while the correctness of Espinasse’s report of it has been called in question on the King’s Bench, (5 Ad. & El., p. 518, per Williams, J.)
But Allesbrook v. Roach has been questioned not so much for the submission of the handwriting to the jury as for the nature of the writings submitted. “ The counsel for the defendant,” says the report, “ then offered to the jury several other bills, [having no connection with the case,] admitted to be of the defend *430 ant’s handwriting,'and desired the jury to compare them and to draw their own conclusion. This loas objected to.” But nevertheless, according to Espinasse’s report, it was allowed.
The subject seems to have slept or the practice to have been undisputed until 1830. Then and in the succeeding ten years-its discussion was revived in a number of cases. The first was Griffith v. Williams, (1 Crompton & Jervis, 47.) It is stated in the report of that case, that in the course of the argument upon a motion for a new trial it was suggested' that u the jury had been influenced by ■a comparison of handwriting which the learned judge had desired them to malee between the admitted and, 'the disputed letters.” Whereupon—
Ter ewiam: u Where two documents are in evidence, it is competent for the court or the jury to compare them. The rule as to the comparison of handwriting applies to witnesses who can only compare a loriting to which they are examined with the-character of the handwriting impressed upon their own minds / but that rule does not apply to the court or jury, who may compare the tico documents when they are properly in evidence.”
The report further shows that the rule nisi for a new trial was subsequently discharged, “ the judgment of Bolland, B.r proceeding on an elaborate comparison which he had made between the letters in question; he pointing out a number of remarkable coincidences between the documents in the formation of several-letters and the mode of writing several words.” So it is evident that comparison of hands was here made by both the jury and the judges of a very learned and careful court.
In the following year, 1831, the same judge stated at theGlamorganshire assizes “ that it was not the indention of the court in that case, (Griffith v. Williams,) and certainly not his. ov7n,to decide anything more than that the jury were at liberty to-compare the disputed handwriting with that of documents which were in evidence in the cause independently of that question.” (Rex v. Morgan, 1 Moody and Robinson’s R., p. 135.)
In a case before Lord Tenterden, the same year, there was a bill of exchange, which wras admitted .to have been drawn and endorsed by the defendant, and a letter containing admissions of the defendant, of which the writing ivas in dispute. The plaintiff in summing up relied strongly on the similitude of the disputed writing with the admitted writing, and Lord Tenterden in charge *431 ing the jury made similar remarks “ and desired the jury to talce the papers and compare them.” (Solita v. Yarrow, id., 133.)
In 1830 there was another case at nisi prius, (Bromage v. Rice, 7 Car. & Payne, 548,) where Allesbrook v. Roach, Griffith v. Williams, and Solita v. Yarrow were all cited by the plaintiff’s counsel as allowing’ him to offer to the jury a great number of bills of exchange in the defendant’s writing, but having nothing to do with the case. Campbell, then Attorney General, objected “ that the jury could not be allowed to compare the signature in dispute with any acknowledged genuine handwriting of the defendant except such as appeared in documents which were properly in evidence in the cause, as being documents in themselves material to the cause.” Littledale, J., (having conferred with Patteson, J.,) said, “ I shall reject the evidence; the ju/ry are not to compare'any other writing with that in dispute except documents which are otherwise evidence in the cause.”-
The same year there was a case before the judges of the King’s Bench in banc, (Perry v. Newton, 5 Ad. & El., p. 514,) in which it had been proposed to submit letters not in evidence for auy other purpose to the jury in order that they might institute a comparison of handwriting. Lord Denman said that Griffith v. Williams had been considered “to go a long way,” and that the real ground upon which it rested was “ that the comparison was unavoidable.” He questioned Allesbrook v. Roach, and thought that the rule in Griffith v. Williams should not be extended, as did all the judges who heard the case. The head-note states the decision very accurately as follows: “ On a question as to the genuineness of handioriting, a jury may compare the document %oith authentic writings of the party to whom it is ascribed, if such writings are in evidence for other purposes of the cause, but not else.”
In 1838 there was another case at nisi prius, where Mr. Baron. Gurney said, “ If these letters and papers Had related to distinct transactions, I thinlc the jury could not have been allowed to look at them ; but as they all relate to this transaction, they may see them.” (Eaton v. Jervis, 8 Car. & Payne, p. 273.) And in 1840, another case before the King’s Bench in banc, where the court reiterated the ruling in Doe v. Newton, and the judges intimated that they were “ not disposed to advance one iota beyond that which had been expressly decided on this point.” (Griffits v. Ivery, 11 Ad. & El., p. 322.)
Thus the cases of Griffith v. Williams and Doe v. Newton *432 became decisive and leading; the one establishing the rule that comparison of handwriting may be made by courts and juries; the other restricting'the comparison to established documents already in the case for other purposes. There can be little doubt but that this became the settled practice iu England, for in a note to Cobbett v. Kilminster, (4 Foster & Finlason R., p. 490,) those learned, careful, and critical reporters say of comparison of handwriting, citing Doe v. Newton, “Before the act, any documents in evidence might be shown to the jury for that purpose.”
The “ act” alluded to in the note is the Common-law Proceedings act of 1854, (17 and 18 Viet., cap. 125, § 27.) It provides that comparison “ tvith any writing, proved to the satisfaction of the judge to be genuine, shall be permitted to be made by witnesses, and such writings and the evidence of witnesses respecting the same may be submitted to the court and jury as evidence of the genuineness or otherwise of the writing in dispute.” This statute changed the law of England, and explains the decisions that have come since its enactment. (Cresswell v. Jackson, 2 Fost. & Fin. R., p. 24; Roupell v. Haws, 3 id., pp. 784, 802.)
Such being the rule as declared by courts of the common law from the time of Lord Kenyon, and there being no contrary 1 American decision upon the express point, it would seem as though there was sufficient authority for the practice if it be intrinsically convenient and right. Bestricted to those cases where the writings have but recently come to the knowledge of the party seeking to use them, and accompanied by the offer of a postponement to the adverse party if he desire to contest them by testimony, it is not perceived by a majority of the court how any great evil can result from the practice, and it is thought that it may be a convenient and expeditious method of making what is often merely formal proof.
The letter referred to ivas written by the claimant at Wilmington, North Carolina, the 10th February, 1865, (as appears by its date,) shortly before the capture of that place on the 22d, and it was addressed to the president of the insurrectionary government. The evidence stopped at that point, and there is nothing to show that it ever emanated from the claimant or was in any way issued or uttered. Since the attaint of Alger-non Sydney was annulled, I presume it has been conceded universally that writing a letter in a man’s closet is not of itself a *433 crime. The production of the letter, unaccompanied by proof of its issuance, or by proof whence its issuance might be inferred, i>roYes nothing against the claimant. Our conclusion is that the mere writing of such a letter by a British subject resident in the insurrectionary districts, unaccompanied by the sending, uttering, or publishing thereof, was not an act of aid or comfort to the rebellion.
But though the mere writing of the letter was not of itself an act of aid or comfort, still the letter, though not issued, may be used for whatever admissions it contains.
Prominent among these is that of having, on the 2d January, 18(55, written and sent a letter to the rebel president, “ making an offer of service.” What was the “ step anticipated” by the claimant in that letter is not fully disclosed in this, but it appears with certainty that it was some plan or project of her own to aid the insurgent government. We think the writing, uttering, and sending of such a letter was an act of aid and comfort to the rebellion, in violation and disregard of the claimant’s proper neutrality as a British subject, and fatal to her case.
The judgment of the court is that the petition be dismissed.