## WITHAUP v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. December 29, 1903.)

No. 1,771.

1. FORGERY—EVIDENCE—OTHER FORGED DOCUMENTS CONNECTED WITH OFFENSE CHARGED.

In a prosecution for the forgery of an indorsement on a pension check which was issued after the death of the pensioner, and the uttering of such check, the voucher on which the check was issued, and one for the succeeding quarter, and a postal card received at the Pension Office, and also purporting to have been signed and sent by the pensioner, but the signatures to all of which were forged, and which, as the evidence tended to show, were sent in furtherance of the same scheme to defraud, were admissible in evidence to prove the guilty intent and knowledge with which the principal acts charged were done.

2. FEDERAL COURTS—RULES OF EVIDENCE IN CRIMINAL CASES.

The rules of evidence governing federal courts in criminal cases are those which were in force in the state at the time such courts were established therein, subject to such changes as have been made by Congress, and are not changed by subsequent state enactments. In Colorado, such rules are those which were in force in the territory at the time it was admitted as a state and created a federal district.

3. FORGERY—PROOF OF SIGNATURE—COMPARISON OF HANDWRITING.

Under the rule of the common law, which prevails in the federal courts in Colorado on the subject, the only papers which are admissible in evidence in a trial for forgery for the purpose of proving by a comparison of handwriting that the alleged forgery was committed by defendant are such as are in evidence in the case for some other relevant purpose, and which are admitted or proved to be in the handwriting or to bear the signature of the defendant, or such as form a part of the record in the case, as a pleading or recognizance bearing the defendant's signature, of the genuineness of which the court may take judicial notice. The court cannot in such case take judicial notice of the genuineness of the signatures to papers filed in other cases, although a part of its own records, and their admission as standards of comparison is error.

4. SAME—INSTRUCTIONS—WEIGHT OF EVIDENCE.

Where an expert witness, who had stated his opinion, from a comparison, that the alleged forged signature and other writings in evidence were written by the same person, was prevented from giving his reasons for such opinion, when asked by the prosecution, by an objection from defendant's attorney, who, in cross-examination, did not call for such reasons, it was proper for the court in instructing the jury, to state that, if permitted, the witness would presumably have been able to declare the reasons upon which he based his opinion; but it was error to go further, and to state, in effect, that such reasons would presumably have been convincing.

In Error to the District Court of the United States for the District of Colorado.

Withaup, defendant in the court below, was there tried and convicted upon an indictment charging him with forging upon the back of a pension check the name of the payee, and with uttering the check with the forged indorsement. The check was dated May 14, 1900, and drawn by the pension agent of the United States at Topeka, Kan., upon the assistant treasurer of the United States at St. Louis, Mo. Pensions are paid quarterly in February, May, August, and November. The pension agency, in mailing each check to a pensioner, sends therewith an unsigned voucher for the next payment, upon the

¶ 2. Federal courts following state practice, see note to O'Connell v. Reed, 5 C. C. A. 594.

return of which in due course, signed by the pensioner. and stating his post-office address, the check for the next quarter is mailed to the address named. Daniel Mosher, named as payee in the check in question, died at Denver, Colo., March 21, 1900, before the check was drawn. Among his effects was the unsigned voucher for the May payment, which had accompanied the pension check mailed to him in February. Evidence was produced by the government tending to show that shortly after Mosher's death this unsigned voucher fell into the hands of Withaup, who was a pension attorney residing in Denver, and familiar with pension matters; that the voucher was subsequently received at the Topeka pension agency, purporting to have been signed by the pensioner, and declaring his post-office address to be 1511 Arapahoe street, Denver, a place shown to have been much frequented by Withaup at that time; that the check for the May payment was issued upon this voucher, and mailed to the pensioner at the address named, and was soon thereafter cashed by a bank in Colorado Springs, Colo., upon a day immediately following Withaup's presence there; that when so cashed the check purported to have been indorsed by the payee; that the unsigned voucher for the August payment, which accompanied the May check, was subsequently received at the pension agency, purporting to have been signed by the pensioner, and declaring his post-office address to be Colorado Springs; and that soon thereafter there was received at the pension agency a postal card purporting to be signed by the pensioner, and requesting that the August check be mailed to Villa Park, instead of Colorado Springs, as requested in his August voucher. Witnesses acquainted with Withaup's handwriting declared their belief that the indorsement upon the May check, and the signatures to the May and August vouchers and to the postal card, were written by Withaup. The court permitted the government to produce in evidence four papers purporting to be signed by Withaup, and to be part of the files of some former case in that court to which Withaup was a party defendant, and two recognizances executed by him in the case on trial, and forming part of its files. The declared purpose of introducing these papers in evidence was that the signatures to them might be used by way of comparison as established standards of Withaup's handwriting. A declaration for increase of pension by one Cogan was also admitted in evidence, along with some testimony to the effect that the body of it was written by Withaup. Assuming the seven papers last mentioned to be proper standards with which to compare the writing in dispute, J. F. Shearman, an expert or specialist in handwriting, called as a witness for the government, testified that the indorsement upon the May check, and the signatures to the May and August vouchers and to the postal card, were all written by the same hand which wrote the body of the Cogan declaration, and the signatures to the other papers used as standards. The introduction of the seven papers, and their use as standards of comparison, were over the defendant's repeated objection and exception. The concluding part of Shearman's examination in chief was as follows: "Q. Could you, Mr. Shearman, make it any plainer to the jury and the court as to how you arrive at your conclusion by the use of the blackboard? A. I think I could. Q. If you will, kindly do so. The Court: I think we will not have that done unless it be called for by the counsel for the prisoner. Q. I will ask you to state, Mr. Shearman, which can be stated orally, and without the use of the blackboard, any explanation of the method by which you reached your conclusion? A. Yes, sir. Q. I wish you would please state it. Mr. Fleming: I believe I have a right to call that out, and not the counsel. The Court: I think it is quite enough for him to state generally that it is the writing of the prisoner, unless the counsel for the prisoner shall call for his methods of ascertaining it." The witness' reason for his opinion, and his method of reaching it, were not asked for by the defendant. Upon this point the court instructed the jury: "Mr. Shearman, called by the government, was of that class. You may recall that when the district attorney proposed here to have him go to the blackboard and show the similarity of hands—the writing of the signature of Daniel Mosher to other writings which had been put in evidence as having been made by the prisoner—that it was left to the prisoner's counsel to inquire in that respect, in relation to that matter, and the prisoner's counsel did not call for that; but, presumably, if he had called for it, Mr. Shearman would have been able to declare before you upon what reasons he proceeded in his decision as to the similarity

of these hands, and how it would be impossible, or at least not a matter to be believed, that another person than the prisoner could have made the writing upon the back of the check." This was excepted to by defendant, and specific exception was taken to the statement of what the witness "could or would have done, had he been permitted to go to the blackboard."

John D. Fleming, for plaintiff in error.

Earl M. Cranston, U. S. Atty. (Ernest Knaebel, Asst. U. S. Atty., on the brief), for the United States.

Before SANBORN, THAYER, and VAN DEVANTER, Circuit Judges.

VAN DEVANTER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

No error was committed in admitting in evidence the May and August vouchers and the Villa Park postal card. They were forgeries, equally with the indorsement upon the May check, because all were written after the death of the pensioner. The evidence tended to show that these forgeries, and the uttering of the forged indorsement, were connected acts in a single scheme to defraud, perpetrated by the defendant. The vouchers and the postal card were therefore admissible, not to show other offenses distinct from those for which he was upon trial, but to prove the guilty intent and knowledge with which the principal acts charged were done. United States v. Doebler, 25 Fed. Cas. 883, No. 14,977; Bottomley v. United States, 3 Fed. Cas. 969, No. 1,688; United States v. Hinman, 26 Fed. Cas. 324, No. 15,-370; United States v. Roudenbush, 27 Fed. Cas. 902, No. 16,198; Commonwealth v. White, 145 Mass. 392, 14 N. E. 611; State v. Rose, 70 Minn. 403, 73 N. W. 177; State v. Hodges, 144 Mo. 50, 45 S. W. 1093; People v. Everhardt, 104 N. Y. 591, 11 N. E. 62; Cohen v. People, 7 Colo. 274, 3 Pac. 385; People v. Frank, 28 Cal. 507, 515.

Much attention has been given in the briefs and oral argument to the court's rulings in admitting in evidence claimed standards of defendant's handwriting, not otherwise relevant to the issues, and in permitting an expert in handwriting, not acquainted with that of defendant, to compare the disputed writings with these standards, and to state whether, in his opinion, they were written by the same hand. This is a subject upon which there is much contrariety of opinion among the courts. In England and several of the states of the Union, statutes have been adopted expressly permitting comparison of a disputed writing with any writing proved to the satisfaction of the court to be genuine, and permitting such writings, and the testimony of witnesses respecting the same, to be submitted to the court and jury as evidence of the genuineness or otherwise of the writing in dispute. Colorado has such a statute, enacted April 3, 1893 (3 Mills' Ann. St. Colo. § 1746c); but Withaup was tried for an offense, not against the state of Colorado, but against the United States, and there is no congressional enactment of this character. The states are without power to prescribe or change the rules of evidence in trials for offenses against the United States, and there is no act of Congress which makes the statutes of the several states, upon this subject, as enacted and changed from time to time, applicable to trials for these offenses. In

United States v. Reid, 12 How. 361, 363, 365, 13 L. Ed. 1023, it became necessary for the Supreme Court to determine the rules of evidence controlling courts of the United States in such trials, and especially to determine whether a court of the United States within the state of Virginia, in a trial for a criminal offense against the United States, should give effect to a statute of that state, adopted in 1849, changing the rules of evidence in that state applicable to the trial of criminal cases. The court said, referring to the judiciary act of 1789 (Act Sept. 24, 1789, c. 20, 1 Stat. 73), and the crimes act of 1790 (Act April 30, 1790, c. 9, 1 Stat. 112), at page 365, 12 How., 13 L. Ed. 1023:

"But neither of these acts makes any express provision concerning the mode of conducting the trial after the jury are sworn. They do not prescribe any rule by which it is to be conducted, nor the testimony by which the guilt or innocence of the party is to be determined. Yet, as the courts of the United States were then organized, and clothed with jurisdiction in criminal cases, it is obvious that some certain and established rule upon this subject was necessary to enable the courts to administer the criminal jurisprudence of the United States. And it is equally obvious that it must have been the intention of Congress to refer them to some known and established rule, which was supposed to be so familiar and well understood in the trial by jury that legislation upon the subject would be deemed superfluous. This is necessarily to be implied from what these acts of Congress omit, as well as from what they contain.

"But this could not be the common law as it existed at the time of the emigration of the colonists, for the Constitution had carefully abrogated one of its most important provisions in relation to testimony which the accused might offer. It could not be the rule which at that time prevailed in England, for England was then a foreign country, and her laws foreign laws. And the only known rule upon the subject which can be supposed to have been in the minds of the men who framed these acts of Congress was that which was then in force in the respective states, and which they were accustomed to see in daily and familiar practice in the state courts. And this view of the subject is confirmed by the provisions in the act of 1789, which refers its courts and officers to the laws of the respective states for the qualifications of jurors and the mode of selecting them. And as the courts of the United States were in these respects to be governed by the laws of the several states, it would seem necessarily to follow that the same principles were to prevail throughout the trial, and that they were to be governed in like manner, in the ulterior proceedings after the jury was sworn, where there was no law of Congress to the contrary.

"The courts of the United States have uniformly acted upon this construction of these acts of Congress, and it has thus been sanctioned by a practice of sixty years. They refer undoubtedly to English works and English decisions. For the law of evidence in this country, like our other laws, being founded upon the ancient common law of England, the decisions of its courts show what is our own common law upon the subject where it has not been changed by statute or usage. But the rules of evidence in criminal cases are the rules which were in force in the respective states when the judiciary act of 1789 was passed. Congress may certainly change it whenever they think proper, within the limits prescribed by the Constitution. But no law of a state made since 1789 can affect the mode of proceeding or the rules of evidence in criminal cases."

The territory embraced in the state of Colorado had not been acquired by the United States in 1789 or 1790, and was not admitted into the Union as a state until 1876. So there are here no known and established local rules in force in 1789 or 1790 which could have been contemplated by Congress when the judiciary and crimes acts were passed. When, however, Colorado was admitted into the Union as a state, it had known and established rules concerning evidence in criminal cases. An act of the territory of Colorado passed November 5, 1861, and in

force at the time of the state's admission, declared the rules of evidence of the common law to be binding on all courts and juries in criminal cases, save in some respects not here material. Laws Colo. 1861, p. 335, § 145; Gen. Laws Colo. 1877, § 821. The acts of Congress under which the state was admitted made it a judicial district, established courts of the United States therein, and clothed them with criminal jurisdiction. To enable them to administer the criminal laws of the United States, it was essential that there should be some certain and established rules of evidence. Congress made no provision upon the subject, other than to declare that "the laws of the United States not locally inapplicable shall have the same force and effect within the said state as elsewhere within the United States." Act June 26, 1876, c. 147, § 1, 19 Stat. 61 [U. S. Comp. St. 1901, p. 328]. It is not material that there are here no known and established local rules in force in 1789 or 1790 which could have been contemplated by Congress when the judiciary and crimes acts were passed, for there was no purpose at that time, and could have been none, to make those acts operative in what is now the state of Colorado. But it is material that Colorado had known and established rules upon the subject at the time when those acts were subsequently fully extended to the new state, and given the same operation there which had been given to them in Virginia and other states at the time of their enactment. The situation incident to the admission of Colorado as a state, and the manner in which Congress dealt with it, were essentially the same as those shown in United States v. Reid, supra. Applying the principles of that decision, it is obvious that it was the purpose of Congress, save where it had legislated otherwise, or should do so in the future, to refer the courts of the United States in the new state to the known and established rules concerning evidence in criminal cases which were in force in Colorado at the time when the judiciary and crimes acts were given the same operation in that state as in other states, which was when Colorado was admitted into the Union as a state. No law of the state enacted thereafter changing the rules of evidence can affect criminal trials in the courts of the United States. Such was, in effect, the decision of the Supreme Court in Logan v. United States, 144 U. S. 263, 298, 303, 12 Sup. Ct. 617, 36 L. Ed. 429, which presented a similar question in respect of the state of Texas. It may be that, in the entire absence of any federal statute and of any known and established rules of evidence in the state at the time of its admission, the rules of evidence found in the common law would govern the courts of the United States in Colorado in the determination of the questions here presented. Moore v. United States, 91 U. S. 270, 23 L. Ed. 346; United States v. Maxwell, 3 Dill. 275, 26 Fed. Cas. 1221, No. 15,750; United States v. Nye (C. C.) 4 Fed. 888; Erwin v. United States (D. C.) 37 Fed. 470, 488, 2 L. R. A. 229; Howard v. United States, 21 C. C. A. 586, 591, 75 Fed. 986, 991, 34 L. R. A. 509. But that need not be decided now. From what has been said, it follows that the admissibility of the evidence under consideration must be determined, not by the statute of Colorado enacted in 1893, but by the common law, which, by reason of the territorial act of 1861, was the law of Colorado when it was admitted into the Union as a state.

Proof of private writings by a comparison of hands or writings is a subject which has received the attention of the federal courts in several reported decisions. Strother v. Lucas, 6 Pet. 763, 767, 8 L. Ed. 573; Rogers v. Riter, 12 Wall. 317, 320, 20 L. Ed. 417; Moore v. United States, 91 U. S. 270, 23 L. Ed. 346; Williams v. Conger, 125 U. S. 397, 413, 8 Sup. Ct. 933, 31 L. Ed. 778; Hickory v. United States, 151 U. S. 303, 14 Sup. Ct. 334, 38 L. Ed. 170; Stokes v. United States, 157 U. S. 187, 193, 15 Sup. Ct. 617, 39 L. Ed. 667; United States v. Craig, 25 Fed. Cas. 682, No. 14,883; Keyser v. Pickerel, 4 App. D. C. 198; United States v. Jones (C. C.) 10 Fed. 469; United States v. McMillan (D. C.) 29 Fed. 247; United States v. Mathias (C. C.) 36 Fed. 892; Medway's Case, 6 Ct. Cl. 421; Blewett's Case, 10 Ct. Cl. 235. These decisions clearly establish that the common-law rule is as follows: (1) It is the general rule that evidence by comparison of hands is not admissible where the witness has no previous knowledge of the handwriting, but is called to testify merely from a comparison of hands. (2) The general rule has exceptions equally as well settled as the rule itself, one of which is that if a paper is in evidence in the case for some other purpose, and is admitted or satisfactorily proven to be in the handwriting of the party, or to bear his signature, the disputed writing may be compared therewith, and its genuineness inferred, or otherwise, from such comparison. (3) A paper, such as a pleading, recognizance, or the like, filed by a party to the case, bearing his signature, and forming part of the record or proceedings in the case of which the court takes judicial notice, may likewise be made the basis of comparison in determining the genuineness, or otherwise, of a writing attributed to that party. (4) Where the disputed writing is not of such antiquity that witnesses acquainted with the person's handwriting cannot be had, papers otherwise irrelevant to the issues, and not in the case as part of its record or proceedings, cannot be introduced in evidence merely for the purpose of instituting a comparison of handwriting. (5) Where a comparison is permissible, it may be made by the court and jury, with or without the aid of expert witnesses. The danger of fraud or surprise, and the multiplication of collateral issues, are the principal reasons for confining the rule within these limits.

The four papers purporting to be signed by the defendant, and to be part of the files of some former case in the trial court, to which the defendant was a party, should not have been received in evidence or used as standards of comparison. They were not themselves proof of their genuineness, and they were not at the trial admitted or proved to be part of the files of the court, or to have been signed by the defendant. Even if part of the files of some former case, they may not have been received or acted upon in that case under circumstances which amounted to a declaration of their genuineness by the defendant. They may have been repudiated by him in that case, or action upon them may have been refused by the court because they were not genuine. A court does not, in the trial of one case, take judicial notice of proceedings had in other cases, even though shown by its own records. Baker v. Mygatt, 14 Iowa, 131; Bond v. White, 24 Kan. 45, 48; Thayer v. Honeywell, 7 Kan. App. 548, 51 Pac. 929; Grace v. Ballou, 4 S. D. 333, 336, 56 N. W. 1075; Gibson v. Buckner, 65 Ark. 84, 44

S. W. 1034; Adler v. Lang, 26 Mo. App. 226; Lake Merced Water Co. v. Cowles, 31 Cal. 215; Ralphs v. Hensler, 97 Cal. 296, 304, 32 Pac. 243. These papers were not otherwise relevant to the issues. They were not standards of comparison without evidence that they were genuine, which might be denied by the defendant. To enter upon this inquiry would raise collateral issues and tend to confuse the jury. Counsel for the government calls attention to a stipulation in the record, and asks the court to say from it that the genuineness of these papers is admitted by the defendant, but this cannot be done. The stipulation was not entered into until two months after the trial, and appears to have been entered into then merely to put into the bill of exceptions a brief description of these papers, and to avoid copying them at length. Whether papers otherwise irrelevant to the issues, and not part of the record or proceedings in the case, but admitted at the trial to be genuine, can properly be received in evidence, and used as standards of comparison, is not clearly determined in the cases heretofore cited, and it is not necessary to determine it here. The admission and use of these four papers as standards of comparison was error.

The two recognizances executed by the defendant in the case on trial are upon a different footing. While judicial knowledge does not extend to the record or proceedings in former or other cases, it does extend to the record and proceedings in the case on trial. State v. Bowen, 16 Kan. 475, 477; State v. Stevens, 56 Kan. 720, 723, 44 Pac. 992; State v. Schilling, 14 Iowa, 455, 459; Kenosha Stove Co. v. Shedd, 82 Iowa, 540, 544, 48 N. W. 933; Searls v. Knapp, 5 S. D. 325, 58 N. W. 807, 49 Am. St. Rep. 873; State v. Ulrich, 110 Mo. 350, 355, 19 S. W. 656; Johnson v. State, 29 Ark. 31, 34, 21 Am. Rep. 154; Hollenbach v. Schnabel, 101 Cal. 312, 35 Pac. 872, 40 Am. St. Rep. 57. In Medway's Case, 6 Ct. Cl. 421, and in Blewett's Case, 10 Ct. Cl. 235, the Court of Claims compared a disputed writing with claimant's signature to his petition; and in Moore v. United States, 91 U. S. 270, 23 L. Ed. 346, the Supreme Court sustained the action of the Court of Claims in comparing a disputed writing with the power of attorney given by the claimant, under the following rule of the latter court (6 Ct. Cl. vi):

"In all cases where the petition of the claimant is signed, and the affidavit thereto made by the agent or attorney of the claimant, there shall be filed with the petition a regular warrant of attorney, duly executed by the claimant to the party so acting on his behalf; and on failure to file such warrant of attorney, the petition will be dismissed."

It was said by the Supreme Court (page 274, 91 U. S., 23 L. Ed. 346):

"It is not distinctly stated in this case that the writing used as a basis of comparison was admitted to be in the claimant's hand, but it was conceded by counsel that it was in fact the power of attorney given by him to his attorney in fact, by virtue of which he appeared and presented the claim to the court. This certainly amounted to a declaration on his part that it was in his hand, and to pretend the contrary would operate as a fraud on the court."

Other decisions to the same effect are Wilber v. Eicholtz, 5 Colo. 241, 243; State v. Noe, 119 N. C. 849, 25 S. E. 812; Vinton v. Peck, 14 Mich. 287, 295. There was no pretense that the two recognizances were surreptitiously or otherwise improperly in the files. Whether they

were properly part of the record and proceedings in the case, and whether, upon their execution and delivery, the defendant had been admitted to bail, were matters of which the court took judicial notice. If the defendant had obtained bail in this manner, or perchance was then enjoying bail so obtained, he would not be heard to deny that he had signed the recognizances. No collateral issue could be raised by admitting and using them as standards of comparison, nor could fraud or surprise result therefrom. There was no error in the rulings in respect of these recognizances.

The Cogan declaration for increase of pension was not a competent standard of comparison. It was otherwise irrelevant to the issues, and was not part of the record or proceedings of the case on trial.

Complaint is made of the instructions given to the jury concerning the unspoken reasons of the government's expert witness for the opinion expressed by him as to the similarity or identity of the handwriting in the papers exhibited to him. As appears in the statement heretofore made, a ruling of the court, fully acquiesced in by defendant's counsel, prevented the government from placing this information before the jury during the examination in chief of the witness, and the defendant did not avail himself of the privilege expressly accorded to him of calling it out upon cross-examination. Defendant's counsel was therefore not in a position to subsequently urge before the jury that the witness' opinion was unexplained or inexplicable. And whether this was done or not, it was entirely appropriate, in view of the situation which the matter had assumed, that the court should call the attention of the jury thereto, and state that presumably the witness would have been able to declare the reasons upon which he proceeded in pronouncing his opinion. Men are so generally able to declare the reasons for their opinions, that where, in testifying as an expert, one has given an opinion from the witness stand, and has expressed himself as willing and able to explain the opinion, but has been prevented from doing so, it may well be said that presumably he would have been able to declare upon what reasons his opinion rested. Thus far the instruction is not subject to criticism. But it also said to the jury that presumably the witness "would have told you how every stroke of the pen was made, and how it would be impossible, or at least not a matter to be believed, that another person than the prisoner could have made the writing upon the back of the check." It is not a matter of common experience or observation that the opinions of men, or of those men who speak as experts in handwriting, are so unerring, or that the reasons for their opinions are so well founded, convincing, and conclusive, as the opinion and reasons of this witness were assumed to be in this instruction. The law does not permit presumptions to be entertained in judicial proceedings which do not comport with, or are contrary to, the common experience or observation of men. The effect of the instruction was to convey to the jury the impression that, as matter of law, the failure of the defendant to exercise the full right of cross-examination accorded to him by the court's ruling was a confession that the reasons in the mind of the witness for the opinion expressed by him were so well founded, convincing, and conclusive as to demonstrate, if stated, that it was impossible, or at least incredible, that the forgery charged was the act of

another person· than the defendant. It was equivalent to. putting into the mouth of the witness, and before the jury, matters to which the witness had not testified, and which did not presumptively flow or result from the testimony which he had given. This was error.

A ruling· of the court sustaining the third, fourth, and fifth counts of the indictment upon which defendant was found guilty is complained of, but a careful examination of the indictment discloses no defect in either of these counts.

The judgment is reversed and the case is remanded, with a direction to grant a new trial.