### GARANFLO v. UNITED STATES.*

#### DUNCAN v. SAME.

(Circuit Court of Appeals, Eighth Circuit. November 16, 1917.)

#### Nos. 4777, 4778.

1. CRIMINAL LAW ⚖➝1169(2)—REVIEW ON APPEAL—HARMLESS ERROR.
    The admission of evidence is not ground for reversal in a criminal case, where the same facts were afterwards shown by defendant's testimony.

2. BANKS AND BANKING ⚖➝257(3)—PROSECUTION—EVIDENCE OF INTENT.
    In a prosecution for willful misapplication of the funds of a national bank by defendants, who were its managing officers, evidence was admissible to show that in their reports to the directors defendants did not

mention a large overdraft by a corporation of which they were the principal stockholders.

3. BANKS AND BANKING ⬳257(3)—TRIAL—RECEPTION OF EVIDENCE.
Rulings on the admission of evidence on the trial for misapplication of funds of national bank *held* not erroneous.

In Error to the District Court of the United States for the Eastern District of Arkansas; F. A. Youmans, Judge.

Criminal prosecution against William H. Garanflo and Robert D. Duncan. Judgment of conviction, and defendants severally bring error. Affirmed.

George W. Murphy, of Little Rock, Ark. (M. J. Manning, George W. Emerson, Wallace Townsend, and E. L. McHaney, all of Little Rock, Ark., on the brief), for plaintiffs in error.

W. H. Martin, U. S. Atty., of Hot Springs, Ark. (W. H. Rector, Asst. U. S. Atty., of Little Rock, Ark., on the brief), for the United States.

Before HOOK, SMITH, and STONE, Circuit Judges.

SMITH, Circuit Judge. The plaintiffs in error were jointly indicted in the District Court of the United States for the Eastern District of Arkansas. There were six counts in the indictment. The first five charged each of the defendants with the willful misapplication of the money, funds, and credits of the State National Bank of Little Rock, in violation of Revised Statutes, § 5209 (U. S. Compiled Statutes 1916, § 9772). The sixth count charged them with conspiring to misapply the money, funds, and credits of the said State National Bank under Criminal Code, § 37 (U. S. Compiled Statutes 1916, vol. 10, § 10201, p. 12552). They were tried to a jury, who found them both guilty on all six counts, and upon the verdict of the jury they were each sentenced to six years in the Atlanta Penitentiary upon each of the first five counts and to two years in the same penitentiary upon the sixth count, all of the sentences to run concurrently in point of time. They sued out separate writs of error to this court. They will be styled as defendants in the further consideration of this case.

In view of the concurrent character of the sentences upon the first five counts, if the case is affirmed on any one of them, the sentence will have to stand. Evans v. United States, 153 U. S. 584, 595, 14 Sup. Ct. 934, 38 L. Ed. 830. As, however, the questions raised upon the appeal are common to all the counts, the case must be either affirmed or reversed upon them all. No objection was ever made to the indictment, or to any count thereof, and there is no criticism of any of the instructions given; but all objections are to the rulings on evidence and the refusal of the instructions asked.

In 1902 the State National Bank of Little Rock was organized. It had at all times material here a capital of $500,000 and a surplus of $45,000. The defendant William H. Garanflo was president, and the defendant Robert D. Duncan was its vice president and cashier. The bank closed its doors and went into voluntary liquidation June 19, 1914.

On February 17, 1915 the Comptroller of the Currency appointed Gen. Lloyd England receiver of the bank.

In 1907 there was organized under the state laws of Arkansas the R. D. Duncan Investment Company. Its name was changed to the State Investment & Trust Company. It bore this new name for a year or such a matter, when its name was again changed to the State Trust Company. These two defendants were the principal holders of the stock in that company, and owned together $29,000 of the $50,000 of its capital stock. Defendant R. D. Duncan was president of this company, and defendant W. H. Garanflo was its vice president. This company had its offices in the State National Bank building. The first five counts of the indictment charge the willful misapplication of the funds of the bank; by the turning over by the defendants of the money and credits of the State National Bank to the State Trust Company in the aggregate of between $81,000 and $82,000.

In its charge to the jury the court said:

"To constitute the crime of willful misapplication it is necessary, not only that there should be a conversion of the moneys, funds, or credits of the bank, to some one other than the bank, but it must also appear that the conversion was made with the intent at the time to injure or defraud the bank."

With the question of fraud thus in the case on the first five counts, and with the sixth count based upon conspiracy, it is not to be wondered at that the plaintiffs in error in their argument say:

"While a wide range is allowed in the introduction of evidence and the examination of witnesses in cases like these, it does not go to the extent of authorizing the admission of testimony which merely tends to facilitate conviction by arousing in the minds of the jury a feeling of prejudice against the accused."

Bearing in mind that a wide range is allowed in the introduction of evidence in such cases, we now turn to the various questions made upon the admissibility of evidence. Plaintiffs in error say in their brief:

"There was not and is not any dispute about the issuing of the drafts and the transfers of credit charged in the first, second, third, fourth, and fifth counts of the indictment. They were clearly proved by the government's witnesses, the bank examiners, and were also testified to by both defendants. The only question about them relates to willfulness and intent."

The North Arkansas Land & Timber Company, a local corporation in which the defendant Duncan was interested, bought 8,400 acres of land at $6 per acre, a total investment of $50,400. With this as its sole assets, it issued its bonds in the sum of $80,000 and stock in the sum of $150,000. Up to the time of the trial no portion of the interest on these bonds had even been paid. This land company had borrowed $48,000 from the State National Bank, through the State Trust Company. The State Trust Company had bought $200,000 of the stock of the State National Bank at $240,000. It borrowed $20,000 to make the first payment of the State National Bank, and gave its note for $220,000 to the Bankers' Trust Company of St. Louis, of which it bought the stock. A few days after the failure of the State

National Bank, the State Trust Company went into the hands of a receiver. It is perhaps only just to say that Mr. Duncan claims this was due to the failure of the State National Bank, the enormous decline of its stock, and the financial difficulties of the Bankers' Trust Company in St. Louis, and its refusal to renew the remaining notes of the State Trust Company given for the stock in the State National Bank.

That in general the State National Bank was defectively managed is perhaps best shown by the fact that early in 1914 its directors were compelled to take out securities which were not regarded as good by the representative of the Comptroller of the Currency to the amount of $210,000, and, when the bank had thus been helped by the retirement of the worst of the paper held by it, it failed in June, 1914. Before its failure, from various causes, there had been great withdrawals of deposits. The claims filed against it were about $850,000. It should have had the amount of assets to pay this, and to pay its capital of $500,000 and its surplus of $45,000, or about $1,395,000. Two years after its failure it had paid 20 per cent. upon the claims filed, or less than 12 per cent. of what its assets should have been. The government showed that, aside from the State Trust Company indebtedness, Duncan's direct and indirect liability to the bank when it failed was about $103,000, and Garanflo's indebtedness of the same character was about $58,000, and the balance of assets, aside from the liability of the stockholders, was not sufficient to meet the obligations to the depositors. The evidence tends to show that the ultimate deficit in the payment of depositors will exceed $300,000. If to this be added the $500,000 of capital, the $45,000 of surplus, and the more than $200,000 paid in to take up the worst of the bank paper by the directors, it is manifest that the bank had lost more than $1,000,000 under the management of the two defendants.

Bearing now in mind that the sole questions in the case are "willfulness and intent" and our holdings in Withaup v. United States, 62 C. C. A. 328, 127 Fed. 530, Olson v. United States, 67 C. C. A. 21, 133 Fed. 849, Exchange Bank v. Moss, 79 C. C. A. 278, 149 Fed. 340, Thomas v. United States, 84 C. C. A. 477, 156 Fed. 897, Colt v. United States, 111 C. C. A. 205, 190 Fed. 305, Schultz v. United States, 118 C. C. A. 420, 200 Fed. 234, Trent v. United States, 143 C. C. A. 170, 228 Fed. 648, Kinser v. United States, 146 C. C. A. 52, 231 Fed. 856, and Samuels v. United States, 146 C. C. A. 494, 232 Fed. 536, Ann. Cas. 1917A, 711, all the specifications of error not hereafter specially considered seem to us to be disposed of adversely to the plaintiffs in error.

[1] Gen. Lloyd England, receiver of the bank, was on the witness stand and was asked:

"Q. Have you assessed the stockholders as the federal laws provide with national banks?

"Judge Manning: We object to the testimony as to the assessments by the Comptroller, as irrelevant and incompetent, or any other testimony that has been introduced along that line.

"Court: The objection is overruled.

"Judge Manning: We except.

246 F.—58

"A. The Comptroller of the Currency has assessed them. Q. Leaving out of consideration the amount received from the assessment, what could have been realized from the assets of the bank proper? (Objected to by the defendants upon the ground that the same was incompetent and irrelevant, which objection was by the court overruled, and the defendants, at the time, each duly and severally excepted.) A. The estimate made based on which the assessment was made was $525,000. Q. Or about 65 per cent. of the amount of the deposits? (Objected to by the defendants upon the ground that the same was incompetent and irrelevant, which objection was by the court overruled, and the defendants, at the time, each duly and severally excepted.) A. Yes."

It is objected in this court that this was not the best evidence. No such objection was made in the court below.

Mr. Duncan, when on the stand, was asked:

"Q. You would think it [the stock in the State National Bank] was as good as Arkansas and Arizona, wouldn't you, even now?"

Thereupon Mr. Duncan voluntarily and without objection on behalf of either defendant said:

"No; I don't think so, because the bank stock has been assessed."

It is probable there was no error, but in any event the proper objection was not made, and the voluntary statement of the defendant Duncan showed substantially the same facts.

[2] Robert Neill, who was a national bank examiner in 1913, testified he was present at a director's meeting of the State National Bank, and both of the defendants were also present, and that two members of the board, one of whom was Mr. H. H. Foster, the other he could not recall, said that that was the first knowledge he had of the existence of the overdraft of $77,000 of the State Trust Company. The statement was made by Mr. Foster:

"That in the condensed statements, which were read to the directors at their meetings, this had never been called to their attention; that this overdraft of the State Trust Company existed."

If Mr. Neill's statement was untrue, both the defendants and all the other directors could have denied it. If it was true, and Mr. Foster, with or without another director, joined in the statement in the presence of the defendants and all the other directors, and they none of them dissented, the jury had a right to say they all acquiesced in its truth. This evidence was clearly admissible on the question of whether the directors knew that such credit was being extended to the State Trust Company, and its extent.

[3] Mr. John E. Coates was a director in the State National Bank and a witness for the defendants. On cross-examination he was asked:

"Q. How much are you indebted to the bank now, Mr. Coates? A. $9,750, secured."

It was manifestly admissible for the government to show on cross-examination of defendant's witnesses, if it could, that they had been parties to the loose management of the bank, as showing their interest

in defending the management and as affecting their credibility. There was no error in this.

During the examination in chief of the defendant Duncan the following took place:

"Q. State what, in your opinion, was the solvency, or the value of the note, of the North Arkansas Land & Timber Company? A. We regarded it good. Q. I will ask you about the North Arkansas Land & Timber Company. Had you been furnished with estimates of the value of its holdings? A. Yes. Q. What is that book, Mr. Duncan (handing a certain book to the witness)? A. This book is a blueprint book of cruise of timber land, made by J. P. Brayton, of Chicago, of the property of the North Arkansas Land & Timber Company. Q. What does that report show as to the amount of timber held by the North Arkansas Land & Timber Company?

"District Attorney Martin: We object to it, your honor.

"Court: On what ground do you think that is competent?

"Mr. Townsend: The only ground upon which it is competent is this: It just gives the basis that Mr. Duncan had for his opinion in considering the North Arkansas Land & Timber Company good. It is a report made by a reporter.

"Court: That is secondary evidence. Now Mr. Duncan— It would be proper for him to state the investigation he made and where he sought information. I don't think that that particular report is competent.

"Mr. Townsend: We desire to save an exception.

"Court: He may testify to the fact that he made an investigation, and as to what his belief was from that investigation—his opinion—but the report itself would not be competent testimony, because that is made by some one who is not a witness, who doesn't identify it himself, who is not sworn.

"Q. I will ask you, Mr. Duncan, if you made any investigation, or any effort, to find out the value of the holdings of the North Arkansas Land & Timber Company? A. Yes, sir; I employed J. P. Brayton, a well-known timber estimator of Chicago, to cruise the property for me, and paid him a fee of $552 for doing so, and got his regular report. Q. Based on his report, but not the report itself, what was your opinion of the value of the timber holdings of the North Arkansas Land & Timber Company? A. Based upon his official report to me, I estimated the timber on said land to be worth—

"District Attorney Martin: He is doing there indirectly what the court says he may not do; he can't give the estimate of the timber from what some one else gave him, or told him.

"Court: He can give the value from the investigation he made.

"District Attorney Martin: He can't say, 'Based on such report, I am of the opinion there was so much timber there.'

"Court: It couldn't be based on anything else from his testimony; he states the manner in which he sought the information. Now, that will go to the jury for what it is worth. It goes to the question of the intent of the defendant in the transactions that he had with the bank in using this particular stock or bonds, or whatever they were, as collateral. You may answer.

"Witness: Based upon the report furnished me, the value of the timber on said land, was $122,047; the value of 6,400 acres of the land was $32,000; making a total valuation of $154,047. The cruise is of 8,800 acres of land, but 400 of it we had no fee-simple title to; about 8,400 acres of land, 6,400 tillable land estimated. Q. Did you, or not, believe that this property was actually worth this amount? A. Yes."

## On cross-examination the following took place:

"Q. Did you consider the North Arkansas Land & Timber Company good for that? A. I considered it good for all of its debts, and if the property is sold to-day for its worth it will pay all it owes. Q. Although it has 8,000 acres of land mortgaged for twice what it cost, and no income, and yet you consider it is good for a loan? A. It was estimated by Chicago estimators to be worth $150,000."

It thus appears the defendant was allowed to testify fully as to what he thought the timber and land were worth, basing his opinion upon the report of Mr. Brayton, but he was not allowed to offer the unsworn statement of the to the court and jury unknown party, Brayton, as direct evidence upon the value. The ruling was so manifestly correct that it requires no further consideration.

Error is assigned upon the failure to direct a verdict for defendants, as asked by them at the close of all the evidence. We have read every word of the evidence as preserved in the record, and find that there was so much evidence of the willfulness and unlawful intent of the defendants that the ruling of the court was correct.

The defendants excepted to the refusal to give each of the five instructions asked. Having read with great care the clear and impartial charge given by the court, we find that every element of the charge as asked, so far as accurate and correct, was given by the court in its instructions.

No error is made to appear, and the judgments as to both defendants are affirmed.